DETROIT LIONS, INC v DEPARTMENT OF TREASURY

Docket No. 88763. Submitted June 18, 1986, at Lansing. Decided November 7, 1986

The Detroit Lions, Inc., filed a complaint in the Court of Claims seeking to recover its payment of a single business tax deficiency assessment to the defendant, Michigan Department of Treasury, and to contest defendant's denial of plaintiff's additional claim for the refund of taxes paid. The tax years involved are 1976 through 1982. The dispute primarily concerns the inclusion of certain revenue in plaintiff's tax base and the computation of the property, sales and payroll factors used to establish plaintiff's Michigan tax base. The trial court, Robert Holmes Bell, J., entered an order and partial summary judgment in favor of the plaintiff with respect to the question of whether television revenue received from and after January 1, 1978, by plaintiff from the National Football League constitutes royalties and is thus to be excluded from the computation of the tax base. Summary judgment for tax years 1976 and 1977 was denied. The court also, on the parties' stipulation, resolved the dispute with respect to the applicable payroll factor to be used. The trial court thereafter granted a summary judgment to defendant based upon its conclusion that defendant's computations of the property and sales factors were correct. Both parties appeal from the final order and judgment of the Court of Claims. The dispute now primarily concerns two questions: (1) whether post-season revenue received by plaintiff from the NFL for activity occurring wholly outside the state and without any participation on the part of plaintiff was properly attributable to Michigan for purposes of the sales factor calculation, and (2) how to interpret the NFL bylaws governing the division of game receipts between a visiting and a home team.

The Court of Appeals *held:*

1. The payments received by the plaintiff in connection with the arrangement between the NFL and the networks regarding live sports broadcast rights should be classified as royalties as

REFERENCES

Am Jur 2d, State and Local Taxation §§ 254 *et seq.;* 704 *et seq.*
See the annotations in the Index to Annotations under Taxes.

that term is used in MCL 208.9(7); MSA 7.588(9)(7). The portion of the order granting a summary judgment to plaintiff as to the tax years 1978 through 1982 is affirmed. The portion of the order which denied summary judgment on the tax years 1976 and 1977 is reversed.

2. The "stadium rental allowance" does not constitute rent as defined by § 6(2) of the Single Business Tax Act. The defendant's decision to disallow inclusion of the deduction for stadium rental allowance as a rental payment in computing the denominator of plaintiff's property factor was proper. The trial court did not err in affirming the defendant's decision in this regard.

3. Plaintiff was properly allowed to include in the denominator of the sales factor only the gross sum which plaintiff derived from the sale of tickets for away games, i.e., its take-home share of the ticket receipts.

4. Plaintiff's post-season revenue for the tax years 1976 through 1979 was earned through plaintiff's membership in the NFL and its performance of duties which arise from that membership. The greater proportion of plaintiff's business activity for those years was performed in Michigan. Thus, under MCL 208.53(b); MSA 7.558(53)(b), the sales were within the state and were properly included in both the numerator and denominator of the sales component of the apportionment formula.

Affirmed in part and reversed in part.

1. TAXATION — SINGLE BUSINESS TAX ACT — ROYALTIES.

The Single Business Tax Act taxes a party which pays royalties rather than the party which received them (MCL 208.1 *et seq.;* MSA 7.558[1] *et seq.*).

2. TAXATION — SINGLE BUSINESS TAX ACT — TAX BASE.

The Single Business Tax Act is a value added tax; a corporate taxpayer's initial tax base is determined by reference to its federal taxable income and various items are then either added or subtracted to arrive at the Michigan tax base; in the case of royalties, all royalties are deducted to the extent included in arriving at federal taxable income and all royalties are added to the extent that they were deducted in arriving at federal taxable income (MCL 208.1 *et seq.;* MSA 7.558[1] *et seq.*).

3. SALES — OWNERSHIP.

Absolute ownership over the subject of a transaction must be passed in order for the transaction to constitute a sale.

4. WORDS AND PHRASES — ROYALTIES.

Royalties are more commonly thought of as payment for the use

of another's patent or copyright, or in connection with oil and gas leases, however, the existence of a copyright or patent is not crucial; the nature of a transaction may justify the conclusion that a royalty is involved even in the absence of a copyright.

5. TAXATION — SINGLE BUSINESS TAX ACT — RENT.
   "Rent" is defined in the Single Business Tax Act as including lease payments or other payments for the use of property not owned by the taxpayer (MCL 208.6[2]; MSA 7.558[6][2]).

6. TAXATION — SINGLE BUSINESS TAX ACT — SALES.
   The Single Business Tax Act provides that sales are in the state if (1) the business activity is performed in this state, or (2) the business activity is performed both in and outside of the state and, based on the costs of performance, a greater proportion of the business activity is performed in this state than is performed outside this state (MCL 208.53; MSA 7.558[53]).

7. TAXATION — SINGLE BUSINESS TAX ACT — BUSINESS ACTIVITY.
   The Single Business Tax Act refers specifically to the activity of the taxpayer in defining the term "business activity" (MCL 208.3[2]; MSA 7.558[3][2]).

*Bodman, Longley & Dahling* (by *David M. Hempstead* and *Charles N. Raimi*), for plaintiff.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Richard R. Roesch* and *Terry P. Gomoll,* Assistant Attorneys General, for defendant.

Before: SHEPHERD, P.J., and J. H. GILLIS and MACKENZIE, JJ.

PER CURIAM. In this case, plaintiff sought review by the Court of Claims of (1) a single business tax deficiency assessment of $129,803.97 issued by defendant, Michigan Department of Treasury, for tax years 1976 through 1979, and (2) plaintiff's refund claim of $429,850 for tax years 1976 through 1982, which defendant had denied. Both parties appeal as of right from the final order and judgment of the Court of Claims.

Plaintiff is a Michigan corporation with its principal place of business in Pontiac, Michigan. Plaintiff operates a professional football team and is a franchised member of the National Football League. Since 1976, plaintiff has filed tax returns under the Single Business Tax Act, MCL 208.1 *et seq.;* MSA 7.558(1) *et seq.* Because plaintiff conducts its business within and without the State of Michigan, plaintiff is required to apportion its tax base to this state under the formula set forth in MCL 208.45; MSA 7.558(45). The apportionment formula is as follows:

$$\text{Tax Base} \times \frac{\text{Property Factor} + \text{Sales Factor} + \text{Payroll Factor}}{3} = \text{Michigan Tax Base}$$

The three factors are defined in §§ 46, 49, and 51 of the SBTA, respectively. Plaintiff disputes the inclusion of certain revenue in its tax base and the computation of the various factors, as determined by defendant.

On January 14, 1983, defendant issued a single business tax deficiency assessment of $17,442, $22,-498, $517, and $28,695 plus accrued interest (updated through January 1, 1983) for tax years 1976, 1977, 1978 and 1979, respectively, for a total liability of $129,803.97. For tax years 1976 and 1977, the tax year commenced on January 1. For tax years commencing with 1978, plaintiff changed its tax year to commence on February 1, 1978. On or about January 22, 1983, plaintiff paid the deficiency assessment in full.

On July 19, 1983, plaintiff filed a complaint in the Court of Claims to recover its payment of the deficiency assessment. Although plaintiff raised the issue of whether the assessment as computed by defendant was violative of the Due Process and

Commerce Clauses of the U.S. Constitution, the primary issues concerned whether television and radio revenue was incorrectly included in calculating plaintiff's Michigan tax base. On December 1, 1983, plaintiff filed an amended complaint in which it added a refund claim of $429,850 for tax years 1976 through 1982, and expanded all claims contained in the original complaint to encompass tax years 1976 through 1982. Defendant had denied plaintiff's request for a refund on or about October 19, 1983.

On June 4, 1984, plaintiff filed a motion for partial summary judgment under GCR 1963, 117.2(2) and (3), now MCR 2.116(C)(9) and (10), contending that television revenue received by plaintiff constituted "royalties" and therefore must be excluded from plaintiff's tax base.

Pertinent facts are as follows. National Football League games are telecast by the major networks, ABC, CBS, and NBC, which pay the NFL substantial sums for that privilege. Contracts, which prescribe the amount to be paid by the networks to the NFL and the conditions applicable to televising the games, were entered into between the NFL and the networks for the tax years in question. Plaintiff, as a franchised member of the NFL, shares equally in the television revenue received by the NFL under the contracts. Plaintiff's share of television revenue was $2,125,372 for 1976 and increased each year thereafter, ultimately reaching $6,771,308 in 1982.

On plaintiff's original single business tax return for tax years 1976 through 1982, plaintiff properly included television revenue in business income, but failed to claim any subtraction from business income for the television revenue as "royalties" or otherwise in arriving at its tax base. Plaintiff's challenge to the inclusion of television revenue in

its tax base followed an informal conference held before the defendant's hearing referee regarding defendant's May, 1980, notice of intent to assess additional single business tax for tax years 1976 through 1979. The referee opined in a written memorandum that television revenue was excludable from plaintiff's tax base because it constituted "royalties." The Commissioner of Revenue, in issuing the July 14, 1983, final deficiency assessment in question in this case, rejected the referee's recommendation.

On September 19, 1984, plaintiff's motion for partial summary judgment was granted in regard to television revenue received by plaintiff after January 1, 1978, primarily based on the Copyright Act of 1976, 17 USC 101 *et seq.,* which became effective on January 1, 1978. Summary judgment for tax years 1976 and 1977 was denied. On December 19, 1984, the Court of Claims entered an order, based on the parties' stipulation, resolving their dispute with respect to the applicable payroll factor to be used in the apportionment formula.

Both parties subsequently filed motions for summary disposition under MCR 2.116(C)(10) on the remaining unresolved issues, namely, the proper property and sales factors to be used in apportioning plaintiff's tax base to Michigan. The dispute now primarily concerns two questions: (1) whether post-season revenue received by plaintiff from the NFL for activity occurring wholly outside the State of Michigan and without any participation on the part of plaintiff was properly attributable to Michigan for purposes of the sales factor calculation, and (2) how to interpret the NFL bylaws governing the division of game receipts between a visiting and a home team.

Pertinent facts with respect to the second question are as follows. Under NFL bylaw 19.1(A), when

plaintiff plays a regular game away from home, it has the option of taking (1) a minimum guarantee of $30,000 or (2) 40 percent of gross ticket receipts after deducting taxes, special charges, and a "stadium rental allowance." Between 1976 and 1981 plaintiff elected option (2) and received net annual season amounts ranging from approximately $1.6 million to $2.3 million for away games. The "stadium rental allowances," which were deducted in arriving at the net annual season amounts, ranged from $284,760 to $410,130. In 1976, defendant admittedly permitted plaintiff to treat the "stadium rental allowances" as rent in computing the property factor for income tax purposes under the then-applicable Income Tax Act of 1967, MCL 206.1 *et seq.;* MSA 7.557(101) *et seq.* Treating the "stadium rental allowance" as rent has the effect of reducing plaintiff's ultimate tax liability. A so-called written "guideline" was drafted by defendant which incorporated this treatment of the "stadium rental allowance." The parties now dispute whether the so-called "guideline" was ever formally adopted, whether defendant relied on it for future tax years, and whether the "stadium rental allowance," in reality, represents a rental charge.

On October 4, 1985, the trial court entered an order granting summary judgment to defendant and dismissing plaintiff's complaint in toto, based upon its conclusion that defendant's computations of the property and sales factors were correct. On October 24, 1985, final judgment was entered. Defendant was ordered to recompute plaintiff's single business tax liability in a manner consistent with the final judgment.

The first issue to be considered is raised by defendant and concerns the plaintiff's tax liability for revenues received from the networks for live

sports broadcast rights. Defendant argues that the order granting summary judgment for the years commencing with 1978 should be reversed, while plaintiff contends that the order should be expanded to include the tax years 1976 and 1977. The issue turns on whether the television revenues in question constitute "royalties" within the meaning of the SBTA, which is in turn significant for purposes of calculating the plaintiff's Michigan tax. base. Pursuant to § 9 of the SBTA, a corporate taxpayer's initial tax base is determined by reference to its federal taxable income. Various items are then either added or subtracted to arrive at the Michigan tax base. Of relevance here is § 9(7), which provided at the time relevant to this action:

> Deduct, to the extent included in arriving at federal taxable income:
>
> *  *  *
>
> (c) All royalties.

A related provision requires that all royalties be added to the extent that they were deducted in arriving at federal taxable income. MCL 208.9(4)(g); MSA 7.558(9)(4)(g). The reason for these calculations is that the Michigan SBTA is a "value added" tax, as opposed to the federal scheme which taxes income. See *Kelvinator, Inc v Dep't of Treasury,* 136 Mich App 218, 226; 355 NW2d 889 (1984). Thus, if the revenues paid by the networks to the NFL and the plaintiff herein are to be considered royalties, plaintiff would not be liable for the payment of taxes on this sum since the Michigan SBTA taxes the party which pays the royalties rather than the one which receives them. *Mobil Oil Corp v Dep't of Treasury,* 422 Mich 473, 477; 373 NW2d 730 (1985).

In determining whether the payments by the

networks to the NFL and plaintiff should be considered "royalties" under the SBTA, we are guided by the Supreme Court's decision in *Mobil Oil, supra,* which involved a similar problem, but in a different context. The *Mobil Oil* Court noted that the SBTA provides no definition of the term and there is an absence of legislative history on the point to use as guidance. Thus, the Court turned to the common understanding of the term, and specifically to the Random House College Dictionary (rev ed), p 1150, which defines "royalty" as:

> [A] compensation or portion of the proceeds paid to the owner of a right, as a patent or oil or mineral right, for the use of it . . . an agreed portion of the income from a work paid to its author, composer, etc., usually a percentage of the retail price of each copy sold . . . a royal right, as over minerals, granted by a sovereign to a person or corporation . . . the payment made for such a right.

and *Black's Law Dictionary* (5th ed), p 1195, which defines "royalty" as:

> Compensation for the use of property, usually copyrighted material or natural resources, expressed as a percentage of receipts from using the property or as an account per unit produced. A payment which is made to an author or composer by an assignee, licensee or copyright holder in respect of each copy of his work which is sold, or to an inventor in respect of each article sold under the patent. Royalty is share of product or profit reserved by owner for permitting another to use the property . . . . In mining and oil operations, a share of the product or profit paid to the owner of the property.

In support of its position that the television revenues represent the payment of a royalty,

plaintiff points to that portion of the above-quoted definitions which refer to a royalty as a payment made·to the holder of a copyright. In this connection, plaintiff stresses the fact that, since January 1, 1978, when the Copyright Act of 1976, 17 USC 101 *et seq.,* became effective, live transmissions of sporting events have been accorded copyright protection when they are recorded simultaneously with transmission. Plaintiff notes that contracts between the NFL and the networks have always provided for recordation. Further, the contracts now expressly recognize the copyright protection given to telecasts of NFL games, as evidenced by the following paragraph from the 1982 agreements entered into between the NFL and the networks:

> 9. Copyright. League on behalf of member clubs is deemed owner of copyright on live telecasts made under this agreement. Network will cause each live telecast to be simultaneously videotaped and will deliver tapes to League upon request (but tapes need not be preserved more than 30 days after the original telecast). Network will cooperate if League sues to prevent threatened infringement or for damages, and any substantial expense will be reimbursed by League. Network may sue in its own name and at its own expense to prevent threatened infringement or for damages (and may retain any damages it recovers) if League is asked but declines to do so. In such cases, League will cooperate, and any substantial expense will be reimbursed by network. Network also agrees to air notices of League and member club ownership and proprietory rights in each game telecast.

The difficulty in resolving the issue presented here arises from the unique nature of the arrangement between the NFL and the networks. The arrangement cannot easily be categorized as either a "sale" or a licensing transaction producing "roy-

alties" because it contains characteristics of both. For example, the contracts entered into between the parties contain language which would support the defendant's argument that a sale is involved. One contract states that "ABC *will purchase* a minimum of fourteen regular season night games each year . . . ." Defendant also points to a letter from the NFL commissioner to an ABC official which states that "[t]he National Football League *agrees to purchase,* a new prime-time television 'Special' package of NFL games . . . ." The transactions also resemble a sale in that the broadcasting rights granted by the NFL are typically "exclusive."

Despite the above, we believe that the transactions at issue are more indicative of a licensing arrangement, and the resulting proceeds more typical of royalty payments, than of a sale. For instance, in order to constitute a sale, absolute ownership over the subject of the transaction must be passed. *Central Discount Co v Dep't of Revenue,* 355 Mich 463, 467; 94 NW2d 805 (1959). However, under the contracts at issue here, numerous rights and privileges are retained by the NFL with respect to the game broadcasts. An example is provided in the 1982 NFL-NBC contract, which grants "exclusive" broadcasting rights to the American Football Conference's regular and championship games. However, the telecasting rights are retained by the NFL with respect to the following circumstances:

> (1) games withheld for the traditional Monday Night Football schedule, (2) games rescheduled due to stadium conflicts arising from post-season baseball championship games, (3) games which the network does not televise for reasons within the network's control, (4) games which the network does not telecast for reasons beyond its control, (5) games rescheduled and not telecast by the network, and (6) game blackouts in a home city.

The right to arrange for telecasts of programs consisting of prior game highlights is also retained. Thus, it seems clear that the transfer of rights under the NFL-network contracts is by no means absolute.

The position of the plaintiff is also strengthened by the fact that, since 1978, the NFL has held a copyright in the live broadcasts of these games. This fact brings the arrangement within a more typical arena of royalty transactions, i.e., payments to the holder of a copyright for the right to make use of the subject of that copyright. However, we do not rely exclusively upon the plaintiff's ownership of the copyright in adopting their position because we believe that the payments made under the 1973 contracts, which covered the 1976 and 1977 tax years, should also be characterized as "royalties." In this connection, we note that while royalties are more commonly thought of as payment for the use of another's patent or copyright (or in connection with oil and gas leases), the existence of a copyright or patent is not crucial. Rather, the nature of a transaction, such as the present, may justify the conclusion that a royalty is involved even in the absence of a copyright. *Comm'r of Internal Revenue v Affiliated Enterprises, Inc*, 123 F2d 665, 668 (CA 10, 1941).

In the instant case, the only substantial difference between the 1973 NFL-network contracts and those entered into in 1976 and 1982 is that the copyright act was amended so as to allow the NFL to obtain a copyright on the live telecasts of their games. The contracts and the arrangements between the parties were essentially the same. Therefore, since we view these contracts as granting the three networks a license to use and exploit, under certain terms and conditions, the product assembled by the NFL, we believe the

transaction cannot be characterized as a "sale." Rather, we believe the payments received by the plaintiff in connection with the arrangement between the NFL and the networks should be classified as "royalties," as that term is used in MCL 208.9(7); MSA 7.558(9)(7). We therefore affirm that portion of the lower court order granting summary judgment in favor of the plaintiff as to the tax years 1978 through 1982. That portion of the order which denied summary judgment on the tax years 1976 and 1977 is reversed.

The next question in this appeal is raised by the plaintiff and involves the defendant's computation of the property and sales factors used to apportion plaintiff's tax base within and without Michigan. A diagrammatic representation of the apportionment formula was presented in *Wismer & Becker Contracting Engineers v Dep't of Treasury,* 146 Mich App 690, 699; 382 NW2d 505 (1985), as follows:

$$\text{TAX BASE} \times [1] \frac{\dfrac{\text{``MICH PROPERTY}[2]}{\text{TOTAL PROPERTY}} + \dfrac{\text{MICH PAYROLL}[3]}{\text{TOTAL PAYROLL}} + \dfrac{\text{MICH SALES}[4]}{\text{TOTAL SALES}}}{3} = \text{MICH TAX BASE}$$

[1] The larger fraction is the § 45 fraction, the numerator of which is composed of three separate fractions.
[2] This is the § 46 fraction.
[3] This is the § 49 fraction.
[4] This is the § 51 fraction."

Both plaintiff and defendant moved for summary judgment on the issue of whether plaintiff's Michigan tax base was properly calculated, and the trial court granted the motion in favor of defendant pursuant to MCR 2.116(C)(10).

We will begin with the dispute involving the

property factor of the above-quoted calculation. This factor is computed by dividing the average value of the taxpayer's real and tangible personal property owned and rented in this state during the tax year by the average value of all such property owned or rented by the taxpayer during the tax year. MCL 208.46; MSA 7.558(46). The property rented by the taxpayer is valued at eight times the "net annual rental rate," which is defined as the annual rental rate paid by the taxpayer less amounts received for subrentals. MCL 208.47; MSA 7.558(47). "Rent" is defined as including lease payments or other payments for the use of property not owned by the taxpayer. MCL 208.6(2); MSA 7.558(6)(2).

The dispute here centers on the plaintiff's contention that it is entitled to include the "stadium rental allowance," defined in NFL bylaw 19.1(A)(2), as rental property in computing the denominator of the property factor. The "stadium rental allowance" represents a deduction to ticket receipts which is taken into account in dividing ticket receipts between the home and away teams. Essentially, the visiting club's share is computed as follows:

$$
\begin{array}{rl}
& \text{Gross Ticket Receipts} \\
- & \underline{\text{Taxes and Special Charges}} \\
= & \text{Total Net Ticket Receipts} \\
- & \underline{\text{Stadium Rental Allowance ("SRA")}} \\
= \text{Total} & \dfrac{\text{Net Ticket Income less SRA}}{\phantom{xxxxxxxxxxxxxx} \times 40\%} \\
= & \text{Visiting Club Share}
\end{array}
$$

The stadium rental allowance is itself computed by

multiplying the "total net ticket receipts" by fifteen percent. Further, a visiting club can opt to take a flat $30,000 fee rather than the amount arrived at by the computation set out above.

At the hearing conducted to consider the motions for summary disposition, plaintiff's attorney contended that the "stadium rental allowance" was intended by the NFL to avoid a chaotic situation where individual teams might attempt to negotiate rental agreements for each game. However, plaintiff's motion was supported only by (1) the affidavit of plaintiff's controller identifying NFL bylaw 19.1, (2) a so-called "guideline" issued by defendant which plaintiff contends authorized it to include "stadium rental allowance" as rent for purposes of computing the property factor, and (3) an allegation in its brief in support of the motion that one-half of plaintiff's games are played outside of Michigan. Defendant's answer to plaintiff's motion contained an affidavit from the administrator of the Single Business Tax Division of the Department of Treasury which indicated that visiting professional football teams in Michigan were not required to include any "stadium rental allowance" as Michigan property for purposes of computing the property factor. Defendant also asserted that plaintiff's tax returns in other states did not include a "stadium rental allowance" allegedly charged to plaintiff as rent.

In rejecting plaintiff's argument that the "stadium rental allowance" should be included in the denominator of the property factor as "rent," the lower court reasoned as follows:

> Plaintiff's construction ignores the obvious intent and function of NFL By-Law 19.1(A). Its design is not to apportion the costs of using a stadium, but to provide a uniform and equitable method by

which gate receipts from a football game are divided between the home club and the visiting club. The rental allowance is designed not to compensate the lessor or sub-lessor of the stadium for the use thereof, but represents a mechanism by which the greater expenses of the home club are recognized and accounted for *before* the gate receipts are divided. As applied in tax years 1976 through 1979, the rental allowance clearly did not constitute payment by plaintiff for the use of property. The Department's decision to disallow inclusion of the deduction as a rental payment in computing the denominator of plaintiff's property factor was proper.

We take the same view of NFL bylaw 19.1(A). Plaintiff has provided no indication that the computation used to arrive at the stadium rental allowance, i.e., fifteen percent of gross receipts minus taxes and special charges, has any correlation to the actual rent charged a home team for use of a stadium. It would seem more likely that it is the home club which actually enters into an agreement with the stadium owner to pay for the use of the property, with the Lions coming into the stadium at the invitation of the home-club renter, and with no contractual obligation to share the cost of renting the stadium.[1] Thus, we agree with the lower court that NFL bylaw 19.1(A) simply takes into account the cost incurred by the home club in providing a site at which the game is to be played, and reduces the visitor's share of the receipts by an appropriate factor roughly representing that cost. We conclude that the "stadium rental allowance" does not constitute "rent" as defined by § 6(2) of the SBTA. Rather than representing "payment for the use of any property," the

---

[1] As defendant notes, in some instances there may be no rental charge at all, as where the stadium is actually owned by the home club.

allowance is merely a concession by the visiting club in recognition of the costs incurred by the home club in providing a site at which the game can be played.

In its cross-appeal from the lower court's order, plaintiff raises various arguments concerning the calculation of the sales component of the apportionment formula. The sales factor is computed as the taxpayer's total sales in this state during the tax year divided by the total sales of the taxpayer everywhere during the tax period. MCL 208.51; MSA 7.558(51). "Sales" are defined as

> the gross receipts arising from a transaction or transactions in which gross receipts constitute consideration: (a) for the transfer of title to, or possession of, property that is stock in trade or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the tax period or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business, or (b) for the performance of services, which constitute business activities other than those included in (a), or from any combination of (a) or (b). [MCL 208.7(1); MSA 7.558(7)(1).]

Plaintiff contends that it is entitled to include its forty percent share of "gross ticket receipts" for away games, rather than its net take-home share of the receipts, in computing the denominator of the sales factor. We disagree, since we believe the phrase "gross receipts" as contained in § 7(1) refers to the *plaintiff's* gross receipts from playing away games, and not the total gross ticket receipts from the game. As discussed above, the record contains nothing to support the conclusion that the plaintiff is responsible for rent or any other expense associated with away games. Rather,

taxes, special charges, and the "stadium rental allowance" are merely taken into account by the NFL in computing what plaintiff's fair share of the ticket receipts for away games should be. Expenses arising from the presentation of the NFL product are the responsibility of the home team. Therefore, plaintiff was properly allowed to include in the denominator of the sales factor only the gross sum which plaintiff derived from the sale, i.e., its take-home share of the ticket receipts.

Plaintiff also contends that it should be entitled to exclude from the numerator of the sales factor all post-season revenue for the tax years 1976 through 1979 because the business activity (i.e., post-season games) occurred entirely outside Michigan and plaintiff did not participate in any post-season games. Defendant, on the other hand, argues that post-season revenue should be included in both the numerator and denominator because the revenue arises from its membership in the NFL.

MCL 208.53; MSA 7.558(53) provides, in pertinent part, that sales are in the state if (1) the business activity is performed in this state, or (2) the business activity is performed both in and outside of the state and, based on the costs of performance, a greater proportion of the business activity is performed in this state than is performed outside this state. "Business activity" means

a transfer of legal or equitable title to or rental of property, whether real, personal, or mixed, tangible or intangible, or the performance of services, or a combination thereof, made or engaged in, or caused to be made or engaged in, within this state, whether in intrastate, interstate, or foreign commerce, with the object of gain, benefit, or advantage, whether direct or indirect, to the tax-

payer or to others, but shall not include the ser-
vices rendered by an employee to his employer,
services as a director of a corporation, or a casual
transaction. Although an activity of a taxpayer
may be incidental to another or other of his busi-
ness activities, each activity shall be considered to
be business engaged in within the meaning of this
act. [MCL 208.3(2); MSA 7.558(3)(2), as amended by
1977 PA 273.]

Plaintiff argues that, since the "business activ-
ity" which produced the post-season revenue, i.e.,
the post-season games, took place outside Michi-
gan, the sales were not in this state as defined by
MCL 208.53; MSA 7.558(53). Defendant argues
that plaintiff incorrectly focuses on the business
activity of the teams which played the post-season
games rather than its own business activity which
gave rise to its entitlement to the revenues. Since
plaintiff admittedly did not play in any post-season
games, defendant argues that there was no busi-
ness activity outside the State of Michigan to
which the plaintiff could attribute its receipt of
post-season revenues. Thus, defendant concludes
that the business activity which gave rise to plain-
tiff's entitlement to post-season revenues must
have occurred within the state.

The lower court resolved the dispute as follows:

Here, although the post-season revenues were
most directly generated by business activity con-
ducted outside of Michigan, plaintiff's entitlement
to a share thereof can only be deemed to have
arisen from its status as a franchised member of
the NFL. As a franchised member of the NFL,
plaintiff engaged in business activity both in and
outside of Michigan. It was and continues to be a
Michigan corporation with its principal place of
business in Pontiac, Michigan. Review of plaintiff's
tax returns for 1976 through 1979 indicates that,

based on costs of performance, a greater propor-
tion of plaintiff's business activity was performed
in Michigan than was performed outside of Michi-
gan. Hence, under SBTA § 53(b), plaintiff's post-sea-
son revenues in 1976 through 1979, representing
consideration for its overall operation of an NFL
club, were properly treated as Michigan sales. The
Department's assessment was, therefore, correct in
this respect as well.

We believe the lower court's approach was cor-
rect. In defining the term "business activity," MCL
208.3(2); MSA 7.558(3)(2) refers specifically to the
activity of the *taxpayer,* and thus we agree that
the proper focus is not on whether the Lions
themselves played in post-season games, but on
the activity which gave rise to their entitlement to
post-season revenue. This revenue was earned
through the plaintiff's membership in the NFL and
its performance of duties which arise from that
membership, such as taking part in football
games, both home and away. As noted by the
lower court, plaintiff's tax returns from 1976
through 1979 reveal that the greater proportion of
plaintiff's business activity was performed within
the state. Thus, under MCL 208.53(b); MSA
7.558(53)(b), the sales were within the state and
were properly included in both the numerator and
denominator of the sales component of the appor-
tionment formula.

Affirmed in part and reversed in part.