MICHIGAN UNITED CONSERVATION CLUBS v DEPARTMENT OF TREASURY

Docket No. 208429. Submitted June 3, 1999, at Lansing. Decided December 10, 1999, at 9:05 A.M. Leave to appeal granted, 462 Mich ___.

Michigan United Conservation Clubs and others brought an action in the Ingham Circuit Court against the Department of Treasury and the State Treasurer, seeking declaratory and injunctive relief forbidding the defendants from depositing into the Environmental Protection Fund money received by the state from the sale or lease of royalty interests in state-owned lands and allocable to the nonconventional fuel credit contained in § 29 of the Internal Revenue Code, 26 USC 29. Such deposits are mandated by subsections 503(4)(1) and 1902(1)(d) of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.503(4)(a), 324.1902(1)(d); MSA 13A.503(4)(a), 13A.1902(1)(d). The plaintiffs contended that subsections 503(4)(a) and 1902(1)(d) violate Const 1963, art 9, § 35, which established the Michigan Natural Resources Trust Fund and requires the deposit into that fund of all bonuses, rentals, delayed rentals, and royalties collected or reserved by the state under provisions of leases for the extraction of nonrenewable resources from state-owned lands, except such revenues accruing under leases of state-owned lands acquired with money from state or federal game and fish protection funds or revenues accruing from lands purchased with such revenues. The court, James R. Giddings, J., declared subsections 503(4)(a) and 1902(1)(d) unconstitutional and permanently enjoined the defendants from depositing money derived from the fuel production tax credit into any fund other than the Michigan Natural Resources Trust Fund. The defendants appealed.

The Court of Appeals *held*:

The proceeds of federal tax credits earned pursuant to 26 USC 29 are not bonuses, rentals, delayed rentals, or royalties collected or reserved by the state under provisions of leases for the extraction of nonrenewable resources from state-owned lands and therefore are not subject to deposit into the Michigan Natural Resources Trust Fund under Const 1963, art 9, § 35. Subsections 503(4)(a) and 1902(1)(d) of the NREPA do not violate Const 1963, art 9, § 35 in requiring that proceeds allocable to the federal tax credit at issue

and received by the state from the sale or lease of royalty interests in state-owned lands be deposited into the Environmental Protection Fund.

Reversed and remanded.

1. STATUTES — CONSTITUTIONALITY.
   Statutes are presumed to be constitutional; to make a successful facial challenge to the constitutionality of a statute, the challenger must establish that no circumstances exist under which the statute would be valid.

2. GAS AND OIL — LEASES — BONUSES.
   A lease bonus is the cash consideration paid by the lessee for the execution of an oil and gas lease by the landowner and is usually figured on a per acre basis.

3. GAS AND OIL — ROYALTIES.
   A royalty is a share of the product or profit paid to a property owner in consideration for the property owner's permission for use of the property in oil or gas production.

4. TAXATION — TAX CREDITS.
   A tax credit is a direct reduction of the tax due and it arises because of a provision in the law.

5. CONSTITUTIONAL LAW — CONSTITUTIONAL PROVISIONS — INTENT — JUDICIAL CONSTRUCTION.
   The intent to be determined by a court engaged in constitutional interpretation is that of the people who ratified the constitutional provision at issue.

*McGinty, Jakubiak, Frankland, Hitch & Henderson, P.C.* (by *Kenneth P. Frankland*), for the plaintiffs.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *A. Michael Leffler*, Assistant in Charge, and *Alan F. Hoffman*, Assistant Attorney General, for the defendants.

Before: MARKEY, P.J., and MCDONALD and FITZGERALD, JJ.

Markey, P.J. Defendants, the Michigan Department of Treasury and the State Treasurer, appeal by right the December 8, 1997, declaratory and permanent injunctive order forbidding defendants from depositing money derived from fuel production tax credits into any fund other than the Michigan Natural Resources Trust Fund, as established under Const 1963, art 9, § 35. The trial court found that subsections 503(4)(a) and 1902(1)(d) of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.503(4)(a); MSA 13A.503(4)(a); MCL 324.1902(1)(d); MSA 13A.1902(1)(d), were unconstitutional because they authorized the diversion of funds otherwise earmarked for the Natural Resources Trust Fund and approved their deposit into the Environmental Protection Fund established under the NREPA.

We find that the trial court erred in holding that subsection 503(4) of the NREPA was an unconstitutional violation of Const 1963, art 9 § 35. The constitutional provision at issue does not prohibit either the assignment of state-owned royalty interests or the reinvestment of proceeds resulting from an assignment or sale where the state retains all royalty payments. Neither does the constitution prohibit the nonpermanent assignment of royalty interests in order to secure additional, otherwise untappable financial resources for the benefit of the state's environment. Furthermore, the transactions that the NREPA authorized do not implicate the concerns that engendered the adoption of art 9, § 35.

I

The key issue argued to the trial court was whether the proceeds of federal tax credits, earned pursuant

to 26 USC 29, which would not have accrued to the state absent the mechanism provided by the NREPA, qualify as "bonuses, rentals, delayed rentals, and royalties collected or reserved by the state under provisions of leases for the extraction of nonrenewable resources from state owned lands" such that they must be deposited in the trust fund that art 9, § 35 created. Stated otherwise, do the estimated tax credits that Motor City Four, L.L.P. agreed to pay to the state from the sale of the state's royalty interest in gas-producing properties to Motor City constitute bonuses, rentals, delayed rentals, or royalties? Because we believe the federal tax credits at issue are not bonuses, rentals, delayed rentals, or royalties, defendants should not be required to deposit the monies collected as a result of these legislatively permissible tax credits into the Natural Resources Trust Fund. Further, the trial court erred in ruling that MCL 324.503(4)(a); MSA 13A.503(4)(a) and MCL 324.1902(1)(d); MSA 13A.1902(1)(d) were unconstitutional because they violated Const 1963, art 9, § 35.

Specifically, plaintiffs claim that the $33,903,483.46 Motor City paid to the state in exchange for the sale or assignment of the state's royalty interests to Motor City under the parties' secured nonrecourse promissory note should have been deposited in the Natural Resources Trust Fund created by art 9, § 35. We disagree.

A

On November 6, 1984, Michigan voters ratified Const 1963, art 9, § 35, which provides, in pertinent part:

There is hereby established the Michigan natural resources trust fund. The trust fund *shall* consist of *all bonuses, rentals, delayed rentals, and royalties* collected or reserved by the state under provisions of leases for the extraction of nonrenewable resources from state owned lands, except such revenues accruing under leases of state owned lands acquired with money from state or federal game and fish protection funds or revenues accruing from lands purchased with such revenues. The trust fund *may* receive appropriations, money, or other things of value. [Emphasis added.]

In 1994, the Legislature passed the NREPA, MCL 324.101 *et seq.*; MSA 13A.101 *et seq.* Subsection 503(4) of the NREPA, as amended by 1996 PA 133, provides, in pertinent part:

(4) The department [of natural resources] may enter into contracts for the sale of the economic share of royalty interests it holds in hydrocarbons produced from devonian or antrim shale qualifying for the nonconventional fuel credit contained in section 29 of the internal revenue code of 1986, 26 U.S.C. 29. However, in entering into these contracts, the department shall assure that revenues to the natural resources trust fund under these contracts are not less than the revenues the natural resources trust fund would have received if the contracts were not entered into. The sale of the economic share of royalty interests under this subsection may occur under contractual terms and conditions considered appropriate by the department and as approved by the state administrative board. Funds received from the sale of the economic share of royalty interests under this subsection shall be transmitted to the state treasurer for deposit in the state treasury as follows:

(a) Net proceeds allocable to the nonconventional fuel credit contained in section 29 of the internal revenue code of 1986, 26 U.S.C. 29, under this subsection shall be credited to the environmental protection fund created in section 503a. [MCL 324.503(4)(a); MSA 13A.503(4)(a).]

MCL 324.1902(1)(d); MSA 13A.1902(1)(d) expressly provides as follows:

> The Michigan natural resources trust fund is established in the state treasury. The trust fund shall consist of all bonuses, rentals, delayed rentals, and royalties collected or reserved by the state under provisions of leases for the extraction of nonrenewable resources from state owned lands. *However, the trust fund shall not include bonuses, rentals, delayed rentals, and royalties collected or reserved by the state from the following sources:*
>
> *       *       *
>
> (d) *Money received by the state from net proceeds allocable to the nonconventional fuel credit contained in section 29 of the internal revenue code of 1986, 26 USC 29, as provided for in section 503* [being MCL 324.503(4)(a); MSA 13A.503(4)(a)]. [Emphasis added.]

Because subsection 503(4)(a) of the NREPA directs that the amounts collected be deposited in "the environmental protection fund," MCL 324.503(4)(a); MSA 13A.503(4)(a), rather than the Natural Resources Trust Fund created by Const 1963, art 9, § 35, plaintiffs initiated a lawsuit claiming that subsection 503(4) of the NREPA was unconstitutional.

B

In light of the presumption favoring the constitutionality of statutes, *McDougall v Schanz*, 461 Mich 15, 24; 597 NW2d 148 (1999); *HJ Tucker & Associates, Inc v Allied Chucker & Engineering Co*, 234 Mich App 550, 556; 595 NW2d 176 (1999), we find that the trial court erred in holding that subsection 503(4) of the NREPA is unconstitutional. The statute is capable of a construction that would avoid constitutional

invalidity, and on its face, it does not contravene the strictures of art 9, § 35.

Constitutional issues are questions of law that we review de novo on appeal. *Mahaffey v Attorney General*, 222 Mich App 325, 334; 564 NW2d 104 (1997). In interpreting constitutional provisions, the primary duty of the judiciary is to ascertain the purpose and intent of the provision at issue. *White v City of Ann Arbor*, 406 Mich 554, 562; 281 NW2d 283 (1979). Constitutional provisions are not subject to the rules applied to statutory construction. *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971). "[U]nder established rules of statutory construction, statutes are presumed constitutional, and *courts have a duty to construe a statute as constitutional* unless unconstitutionality is clearly apparent." *Mahaffey, supra* at 344 (emphasis added). To make a successful facial challenge to the constitutionality of a statute, the challenger must establish that *no circumstances exist under which the statute would be valid. Council of Organizations & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 568, 602; 566 NW2d 208 (1997). Similarly, an interpretation of the constitution itself that does not create a constitutional invalidity is preferred to one that does. *House Speaker v Governor*, 443 Mich 560, 585; 506 NW2d 190 (1993).

In this case, then, we must determine whether subsection 503(4) of the NREPA is capable of *any* construction that would make it constitutional. We believe that it is. First, we must ask whether the constitutional language is unambiguous and, if so, whether the statute comports with the language of the constitution itself. Moreover, if the meaning of the

constitutional language is plain, resort to extrinsic evidence is unnecessary. *Bond v Ann Arbor School Dist*, 383 Mich 693, 700; 178 NW2d 484 (1970). Accordingly, this Court is called on to determine whether the plain language of art 9, § 35 is at odds with the statute.

Only if the language of art 9, § 35 admits of varying interpretations should this Court undertake an examination of the circumstances surrounding its ratification. We find that the constitutional language at issue is unambiguous. Article 9, § 35 provides that "bonuses, rentals, delayed rentals, and royalties collected or reserved by the state under provisions of leases for the extraction of nonrenewable resources from state owned lands" shall be deposited in the Natural Resources Trust Fund. Const 1963, art 9, § 35. If this Court finds that the terms "bonuses," "rentals," "delayed rentals," and "royalties" have a definite and clear meaning, then the inquiry in this case must cease. We believe that these terms have clear and unambiguous meanings.

C

Terms of art and technical terms should be given their special meanings. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 186; 521 NW2d 499 (1994). All the terms in this discussion are technical or terms of art, but none of them describes the payments that Motor City is making to the state. A "lease bonus is the 'cash consideration paid by the lessee for the execution of an oil and gas lease by the landowner . . . . Bonus is usually figured on a per acre basis.' " See *Total Petroleum, Inc v Dep't of Treasury*, 170 Mich App 417, 423; 427 NW2d 639 (1988), quoting *Comm'r*

*of Internal Revenue v Engle*, 464 US 206, 210; 104 S
Ct 597; 78 L Ed 2d 420 (1984).  Here, the money
derived from tax credits that Motor City conveyed to
the state was neither consideration for a lease nor
calculated on a per acre basis. Moreover, as defend-
ants point out, plaintiffs have not averred (for seem-
ingly obvious reasons) that the credit is a rental or
delayed rental payment.

Finally, the tax credits also do not qualify as royal-
ties. In *Mobil Oil Corp v Dep't of Treasury*, 422 Mich
473; 373 NW2d 730 (1985), our Supreme Court was
called on to define the meaning of "royalties" in the
context of the federal tax treatment of oil and gas
leases. The Court explained:

> *The Random House College Dictionary* defines a "roy-
> alty" as:
>
> "[A] compensation or portion of the proceeds paid to the
> owner of a right, as a patent or oil or mineral right, for the
> use of it . . . .an agreed portion of the income from a work
> paid to its author, composer, etc., usually a percentage of
> the retail price of each copy sold . . . a royal right, as over
> minerals, granted by a sovereign to a person or corporation
> . . . the *payment* made for such a right. [*The Random
> House College Dictionary* (rev ed), p 1150.  Emphasis
> added.]"
>
> This definition includes mineral and oil "royalties" with the
> "royalties" paid for patents and copyrights and refers to
> them as a "payment." Black's Law Dictionary defines a "roy-
> alty" as:
>
> "Compensation for the use of property, usually copy-
> righted material or natural resources, expressed as a per-
> centage of receipts from using the property or as an
> account per unit produced. A payment which is made to an
> author or composer by an assignee, licensee or copyright
> holder in respect of each copy of his work which is sold, or
> to an inventor in respect of each article sold under the pat-
> ent. Royalty is share of product or profit reserved by owner

for permitting another to use the property. . . . In mining and oil operations, a share of the product or profit *paid* to the owner of the property. [Black's Law Dictionary (5th ed), p 1195. Emphasis added.] [*Mobil Oil Corp, supra* at 484.]

This passage clarifies that a royalty has the following elements or characteristics: (1) it is a payment, (2) in the form of either the product itself or proceeds from the sale of the product, and (3) made in consideration for the use of the property. In this case, the tax credit has none of these characteristics. First, a tax credit to a taxpayer is not a payment. Rather, a tax credit "is a direct reduction of the tax due. A credit arises . . . because of a provision in the law . . . ." 33 Am Jur 2d, Federal Taxation, ¶ 1270, p 685. Second, plaintiffs might argue that even if the credit due Motor City was not an affirmative payment, Motor City's transfer of funds back to the state *was* a payment, qualifying the transfer as a royalty. The transfer of funds back to the state was not in the form of the product or its proceeds, however. Rather, the transfer of money from Motor City to the state was made in consideration for whatever tax benefits might accrue to Motor City pursuant to this transaction. Indeed, even assuming that the promissory note to the state was based on an estimate of the tax credits that Motor City could recover, and the amount of the tax credits was calculated according to the amount of gas produced, the tax credits do not constitute production payments, sale proceeds, or royalties. We find no authority requiring that these distinct sources of funding be lumped into one category. And third, Motor City never actually used the state's land, but instead acquired an ownership interest in royalties derived from extracting natural gas from the land,

and all royalty payments were transferred back to (or, in effect, remained with) the state in the form of a production payment.

On the basis of the clear and unambiguous meanings of the terms found in art 9, § 35, we cannot conclude that the payments from Motor City to the state were in the form of a percentage of the product extracted from the state's property. Indeed, Motor City did not receive the tax credits from a buyer of the product. The payment of $33,903,483.46 plus interest under a secured, nonrecourse promissory note from Motor City to the state was apparently calculated on the basis of the estimated tax credit Motor City subsequently would be entitled to claim or receive under § 29 of the Internal Revenue Code of 1986, 26 USC 29, *not* from the sale of the product extracted from state property. When it signed the promissory note, Motor City granted back to the state all royalty interests in the property, so the royalty payments remained with the state.[1] Although this transaction is complicated, the trial court missed the mark by concluding that this agreement "convert[ed] what the State gets for selling its royalty interest or conveying its interest into nonroyalty payments." On the contrary, the state retains all the royalty payments from the property. The amount of money arising from these royalties and being deposited in the Natural Resources Trust Fund remains unchanged. The money that Motor City paid to the state, and which will be deposited in the Environmental Protection Fund, represents the value of the tax credits it will

---

[1] This Court finds it curious that no one has offered an explanation regarding the benefits that accrue to Motor City from its participation in this transaction, but we will not speculate on this topic.

receive as a result of the purchase and sales agreement Motor City executed with the state. Nothing in this transaction deprives the Natural Resources Trust Fund of any monies it was entitled to receive before subsection 503(4) was enacted.

D

We reiterate that our Court must view this challenge from the perspective of determining whether the statute is capable of any construction that would make it constitutional. Article 9, § 35 specifies that only royalties, bonuses, and rentals must be included in the trust fund. Subsection 503(4)(a) does not violate that provision by placing into the Environmental Protection Fund the otherwise unavailable *proceeds* arising out of the transfer of the state's royalty interests to a third party who can, unlike the state, generate additional income merely by holding the interest. No one argues or demonstrates that the royalty payments generated by the property that was assigned or sold to Motor City are being diverted from the trust fund. No one argues or demonstrates that the trust fund is losing money because of the contractual relationship between the state and Motor City. In fact, the trust fund would be in the same position today had subsection 503(4)(a) never been adopted. Moreover, the Legislature has enabled the state to further benefit the environment by cleaning up "brownfields" with the proceeds of the tax credits. Thus, we find that because the statute is capable of a constitutional interpretation, it must be upheld. *Council of Organizations & Others for Ed about Parochiaid, supra.*

Also, looking at the plain language of both the constitution and the statute at issue, we find nothing in

art 9, § 35 to prohibit the state from assigning lease interests in state land that produces royalties from the extraction of natural resources where the state retains the right to receive royalties, as it did here. More importantly, nothing in art 9, § 35 requires that all lease proceeds, no matter what their form or how derived, must be deposited in the Natural Resources Trust Fund.

E

It is uncontested that the nonconventional fuel tax credit created in § 29 of the Internal Revenue Code and referenced in subsection 503(4) represents a *federal* attempt to encourage taxpayers to develop nonconventional fuels by allowing taxpayers who own interests in property or facilities that produce nonconventional fuels (such as shale or tar sands) to claim a tax credit of $3 per quantity of fuel equal to one barrel of oil.[2] 33A Am Jur 2d, Federal Taxation, ¶¶ 15551-15552, pp 848-849. Because the tax credit is available to taxpayers, and because the state of Michigan is not a taxpayer, the *credit is not ordinarily available to the state of Michigan* even though the state owns property and facilities that produce nonconventional fuels. Consequently, through subsection 503(4) of the NREPA, the Legislature has creatively enabled the state to take advantage of the federal tax credit (i.e., money otherwise unavailable to the state) by permitting taxpayers to acquire, subject to rever-

---

[2] The barrel of oil equivalent for qualified fuel is 5.8 million BTU's of energy. In certain cases, the $3 amount is adjusted for inflation by multiplying it by the inflation adjustment factor for the calendar year when the sale of the fuel occurs to an unrelated party. Thus, as adjusted, the $3 amount is $6.10 for calendar year 1997 and $5.95 for calendar year 1996. 33A Am Jur 2d, Federal Taxation, ¶ 15551, p 848.

sionary rights, limited interests in the state property and facilities that produce nonconventional fuels.

Specifically, taxpayers are permitted to purchase the state's interest in royalty payments, to avail themselves of the tax credit commensurate with their ownership interests in the state's land, and to convey back to the state by quarterly payments the value of the tax credits to which the taxpayers are entitled. The taxpayers do not, however, receive royalty payments; these payments are made to the state and are still deposited in the Natural Resources Trust Fund in compliance with art 9, § 35.[3] Thus, any taxpayer involved in one of these contracts with the state is acting as an intermediary receiving funds that the *state would not be entitled to claim directly.*[4] By

---

[3] Moreover, the agreement between Motor City and the state provided that royalties, i.e., those payments made to the state by users of its land by reservations of the product of the land or the proceeds from the product, were to continue to be made directly to the state and deposited in the trust fund created by art. 9, § 35. Thus, the contract itself draws a distinction between royalties and other money, a distinction that comports with the legal definition of "royalties" and conforms the contract to the strictures of the NREPA, which states:

> [I]n entering into these contracts, the department shall assure that revenues to the natural resources trust fund under these contracts are not less than the revenues the natural resources trust fund would have received if the contracts were not entered into. [MCL 324.503(4); MSA 13A.503(4).]

This statutory language represents the Legislature's awareness of and effort to conform the NREPA to the requirements of art 9, § 35. Here, the statutory language on its face ensures that subsection 503(4)(a) will not be used to undermine the constitution.

[4] As referenced in n 1, *ante* at 80, we acknowledge that this relationship, on its face, appears to be very one-sided in favor of the state. In fact, the trial court asked counsel during oral argument why a taxpayer would enter into such an agreement with the state when no apparent benefit would accrue to the taxpayer. Notably, this question was never authoritatively answered, but it was suggested that there would be future tax advantages for taxpayers involved in these transactions.

allowing participating taxpayers to collect the tax credit and then requiring these taxpayers to pay to the state of Michigan amounts equal to the value of the tax credits, the state (and the environment) ultimately reaps the benefits of the federal tax credit without depriving the Natural Resources Trust Fund of its bonuses, rentals, delayed rentals, or royalties.

So, while the plaintiffs emphasize how subsection 503(4)(a) *can* be interpreted to reach the conclusion that it violates the constitution, this Court must attempt to give the statute the benefit of constitutionality. Plaintiffs have failed to meet their burden because they have not proved that the statute is incapable of a constitutional interpretation. *Council of Organizations & Others for Ed About Parochiaid,* *supra.*

F

Even were this Court to reach the issue of the voters' intent in ratifying art 9, § 35, we find that subsection 503(4) of the NREPA does not undermine the effect the voters intended. When a court engages in constitutional interpretation, the intent to be determined is that of the people who ratified the constitutional provision at issue. *Charles Reinhart Co v Winiemko,* 444 Mich 579, 605-606; 513 NW2d 773 (1994). To determine this intent, courts apply the rule of common understanding; i.e., " '*the interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.*' " *Bolt v City of Lansing,* 459 Mich 152, 160; 587 NW2d 264 (1998), quoting *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971) (emphasis in original). To clarify

meaning, the circumstances surrounding the adoption of a constitutional provision and the purpose sought to be accomplished may be considered. *Bolt, supra* at 160. Thus, the court should place itself in the position of the ratifiers and ascertain what was meant at the time the provision was adopted. *Charles Reinhart Co, supra* at 606. In doing so, the court may consider the general spirit of the times and the sentiments prevailing among the people. See *People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884).

Plaintiffs argued, and the trial court apparently agreed, that although subsection 503(4) of the NREPA specifically references royalties, rent, and bonuses, the voters who passed art 9, § 35 likely understood that *all* revenue derived from leases of state land would be deposited in the trust fund created by that section. We disagree. Critically, the language of Proposal B, the initiative that became art 9, § 35, stated that the Natural Resources Trust Fund would be "funded by *certain* royalties, bonuses and rentals *collected by the state from the drilling of oil and gas or mining of minerals on state-owned land*" (emphasis added). Nothing in Proposal B guaranteed that *all revenue* from *any source* arising out of the extraction of nonrenewable resources from state-owned land would be deposited into the trust fund. Here, the state is not collecting money from natural gas drilling or mining. The trial court's conclusion also ignores the structure of art 9, § 35 itself, which expressly differentiates between "bonuses, rentals, delayed rentals, and royalties collected or reserved by the state under provisions of leases for the extraction of nonrenewable resources from state owned lands," which "*shall*" be deposited in the trust fund, and "appropria-

tions, money, or other things of value," which "*may*" be deposited in the trust fund. Had the drafters of art 9, § 35 meant to suggest that all revenue derived from the leasing of state-owned land must be deposited in the trust fund, the drafters would not have provided a mechanism making the deposit of certain revenue optional. Indeed, one of the strongest arguments cutting against the trial court's holding is that money derived from a *tax credit*, directly or indirectly, is more properly characterized as "money, or other things of value" than "royalties."

Plaintiffs also represent that art 9, § 35 was adopted to prevent "raids" on the Natural Resources Trust Fund by affording the fund constitutional protection. Specifically, plaintiffs claim that art 9, § 35 was drafted in response to a 1979 diversion of money from the trust fund to a loan program for refurbishing tankers, a 1980 diversion of money from the fund to the state's general fund to cure budget woes, and a 1982 diversion of $46 million from the fund to a venture capital program for small businesses. Even accepting these explanations as true, plaintiffs have failed to demonstrate how the transaction between the state and Motor City qualifies as a "raid."

Whereas plaintiffs cite transactions involving the removal of money from the Natural Resources Trust Fund or the failure to deposit money in the fund that would otherwise have been deposited there, this case involves the situation where money that would not have existed absent § 29 of the Internal Revenue Code and the enactment of subsection 503(4) of the NREPA was deposited in a fund other than the art 9, § 35 trust fund. In other words, this case does not involve the diversion of existing funds. Rather, it

involves the question of *where* newly created revenue should be deposited. Indeed, subsection 503(4) of the NREPA cannot properly be characterized as a "raid" because it does not direct the *removal* of money from the trust fund or the *diversion* of pre-existing money, or money generated from defined sources that would be channeled to the fund, from the trust fund to a discrete cause. Thus, the motivations underlying the adoption of art 9, § 35 are not offended here.

In conclusion, we believe that no circumstances exist to rebut the presumption of constitutionality afforded to the NREPA. See *McDougall, supra; Council of Organizations & Others for Ed About Parochiaid, supra.* We therefore find that the trial court erred in holding that subsections 503(4) and 1902(1)(d) of the NREPA were an unconstitutional violation of Const 1963, art 9, § 35. Furthermore, it is unlikely that the statutorily authorized transactions implicate the concerns that engendered the adoption of art 9, § 35. For these reasons, we reverse the trial court's findings.

Reversed and remanded for entry of an order consistent with this opinion. We do not retain jurisdiction.