FIELD ENTERPRISES v DEPARTMENT OF TREASURY

Docket No. 114532. Submitted January 3, 1990, at Lansing. Decided June 5, 1990. Leave to appeal applied for.

Field Enterprises, seeking a single business tax refund, brought an action in the Court of Claims against the Department of Treasury. Plaintiff, an operator of a television station, alleged that defendant, in determining plaintiff's tax base, had improperly characterized as royalties, rather than rent, payments made by plaintiff to Twentieth Century-Fox Television Corporation pursuant to an agreement whereby Fox granted plaintiff a license to telecast episodes of a television series whose copyright was held by Fox. The court, James R. Giddings, J., determining that the payments in question were rent, issued a judgment in favor of plaintiff. Defendant appealed.

The Court of Appeals *held:*

The Single Business Tax Act provides that royalties paid by a taxpayer shall be included in the tax base of the taxpayer. Although the act itself does not define the term "royalties," the term can be defined as payments to the holder of a copyright for the right to make use of the subject of the copyright. In this case, the payments made by plaintiff to Fox are royalties and are properly includable in plaintiff's tax base for purposes of the single business tax.

Reversed.

1. TAXATION — SINGLE BUSINESS TAX ACT — ROYALTIES.

The Single Business Tax Act imposes a tax on a party which pays royalties rather than the party which receives them (MCL 208.9[4][g], 208.9[7][c]; MSA 7.558[9][4][g], 7.558[9][7][c]).

2. TAXATION — SINGLE BUSINESS TAX ACT — ROYALTIES — COPYRIGHTED WORKS — TELEVISION EXHIBITION.

Payments made by a television station operator to the holder of the copyright to a television program pursuant to an agreement granting the station operator a license to telecast the program are royalties which are properly includable in the tax

REFERENCES

Am Jur 2d, Telecommunications § 150.

See the Index to Annotations under Royalties; Taxes; Television.

base of the station operator for purposes of the single business tax.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Thomas D. Hammerschmidt* and *Timothy G. Reaume*), for plaintiff.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Richard R. Roesch* and *Charles E. Liken,* Assistant Attorneys General, for defendant.

Before: MARILYN KELLY, P.J., and GILLIS and MacKENZIE, JJ.

PER CURIAM. Defendant appeals as of right from an amended "consent" judgment entered in favor of plaintiff awarding it a tax refund, including penalties and interest. We reverse.

Plaintiff filed suit in the Court of Claims seeking a tax refund, arguing that defendant had improperly characterized payments plaintiff had made under a television syndication license agreement as royalties rather than rent. The parties agree that the television syndication license agreement which plaintiff entered into with Twentieth Century-Fox Television Corporation (Fox) on July 10, 1979, is representative of the agreements in issue. Under that agreement Fox granted plaintiff a limited television exhibition license. Pursuant to the license, plaintiff was allowed to show 197 M*A*S*H videotapes on WKBD-TV, its Detroit station. Plaintiff could show each videotape up to six times in the six-year license period. The license fee was $797,600 or $4,048 per episode. Plaintiff was to pay this amount in one installment of $13,490 on September 1, 1979, and then fifty-nine monthly installments of $13,290 beginning on October 1, 1979. Plaintiff agreed to pay Fox whether

or not it telecast the episodes. Plaintiff could not sublicense or relicense the episodes or copy the episodes. Fox agreed not to license the episodes to any other television station licensed by the Federal Communications Commission to operate in plaintiff's market or to any cable station operating in a specified zone. Fox retained all rights, title and interest in the episodes and plaintiff was required to telecast each episode with Fox's copyright notice.

Plaintiff also filed a separate lawsuit to recover taxes paid from 1979 to 1982. The Court of Claims judge hearing that suit determined that the payments made by plaintiff were rents and not royalties. Because the instant action was assigned to the same judge, the parties entered a "consent" judgment wherein defendant agreed to refund monies to plaintiff, given the judge's decision in the other action. Defendant then filed a claim of appeal which was rejected by this Court because defendant was not an aggrieved party under the terms of the consent judgment. The parties then filed an amended "consent" judgment wherein their right to appeal was preserved. Defendant now appeals as of right.

Defendant claims that the monies paid by plaintiff were royalties. Plaintiff, however, claims that the monies were rent.

The Single Business Tax Act imposes a value-added tax. *Detroit Lions, Inc v Dep't of Treasury,* 157 Mich App 207, 214; 403 NW2d 812 (1986). It provides that all royalties, to the extent deducted in arriving at federal taxable income, be added in determining the taxpayer's tax base. MCL 208.9(4)(g); MSA 7.558(9)(4)(g). A related provision requires that the taxpayer deduct royalties, to the extent included in arriving at federal taxable income, in determining its tax base. MCL 208.9(7)(c); MSA

7.558(9)(7)(c). Hence, the party who pays the royalties rather than the one who receives them pays taxes under the act. *Id.* See also *Mobil Oil Corp v Dep't of Treasury,* 422 Mich 473, 477; 373 NW2d 730 (1985). On the other hand, rent is not included in determining a taxpayer's tax base.

The act states that " '[r]ent' includes a lease payment or other payment for the use of any property to which the taxpayer does not have legal or equitable title." MCL 208.6(2); MSA 7.558(6)(2). While the act does not define the word "royalties," it provides that terms used which are not defined shall have the same meaning as when used in a comparable context under federal income tax laws unless a different meaning is clearly required. MCL 208.2(2); MSA 7.558(2)(2).

Moreover, noting that the act provided no definition for the word "royalties," our Supreme Court used the common understanding of the term. *Mobil Oil Corp, supra,* p 484. The Court relied on the *Random House College Dictionary (rev ed),* p 1150, which defines "royalty" as:

> [A] compensation or portion of the proceeds paid to the owner of a right, as a patent or oil or mineral right, for the use of it . . . an agreed portion of the income from a work paid to its author, composer, etc., usually a percentage of the retail price of each copy sold . . . a royal right, as over minerals, granted by a sovereign to a person or corporation . . . the payment made for such a right.

The Court also relied on Black's Law Dictionary (5th ed), p 1195, which defines "royalty" as:

> Compensation for the use of property, usually copyrighted material or natural resources, expressed as a percentage of receipts from using the

> property or as an account per unit produced. A payment which is made to an author or composer by an assignee, licensee or copyright holder in respect of each copy of his work which is sold, or to an inventor in respect of each article sold under the patent. Royalty is share of product or profit reserved by owner for permitting another to use the property . . . . In mining and oil operations, a share of the product or profit paid to the owner of the property.

Hence, the Court concluded that the Legislature used the common meaning of the word "royalty" (i.e., a payment received by the tranferor in patent, copyright, mineral, and oil and gas transactions) in the act. *Mobil Oil Corp, supra,* p 485.

In *Detroit Lions, Inc,* the plaintiff filed suit contending that television revenues it received from ABC, CBS, and NBC as the result of its membership in the National Football League were royalties. The Court of Claims agreed that payments made after the effective date of the Copyright Act of 1976, 17 USC 101 *et seq.,* were royalties. The plaintiff appealed, claiming that revenues received before the effective date of the Copyright Act of 1976 were royalties. The defendant argued that revenues were sales. In determining whether the payments by the networks to the NFL and the plaintiff should be considered royalties, this Court relied on the definitions used in *Mobil Oil Corp.* The plaintiff argued that the payments it received were royalties because those definitions referred to a royalty as a payment made to the holder of a copyright and because live transmissions of sporting events had been accorded copyright protection under the Copyright Act of 1976 when they were recorded simultaneously with transmission. This Court noted that the arrangement between the television networks and the NFL could not easily

be characterized as a sale or a licensing transaction producing royalties because it contained characteristics of both. This Court noted that the contracts contained sale language and that the broadcast rights granted by the NFL were exclusive. Nonetheless, this Court concluded that the transaction was indicative of a licensing arrangement and that the resulting proceeds were more typical of royalty payments than of a sale. In so holding, this Court noted that the NFL did not transfer absolute ownership over the subject of the transaction and instead reserved telecast rights in certain circumstances. This Court also found the plaintiff's position strengthened by the fact that the NFL had held a copyright to live broadcasts of the games since 1978. This fact brought the arrangement within the arena of a royalty transaction, "*i.e.,* payments to the holder of a copyright for the right to make use of the subject of that copyright." *Detroit Lions, Inc, supra,* p 219. Nonetheless, this Court did not rely exclusively on the NFL's ownership of a copyright in determining that the revenues were royalties because it also concluded that revenues received before 1978 should also be characterized as royalties. While noting that "royalties are more commonly thought of as payment for the use of another's patent or copyright," this Court held that the existence of a copyright is not crucial and that the nature of the transaction may justify a conclusion that a royalty is involved. *Id.,* p 218. Thus, this Court concluded that the contracts granted the three networks a license to use the product assembled by the NFL and, therefore, the payments received by the plaintiff in connection with that arrangement were royalties.

On appeal, defendant argues that the M*A*S*H episodes were copyrighted material and that plaintiff's payments were royalties because a royalty is

a payment to the holder of a copyright. Moreover, defendant notes that the agreement between plaintiff and Fox was a license which this Court described as a transaction which produced royalties in *Detroit Lions, Inc, supra,* pp 216-217. Defendant also notes that 26 USC 543(a)(4) defines copyright royalties as "compensation, however designated, for the use of, or the right to use, copyrights in works protected by copyright issued under title 17 of the United States Code . . . . "

Plaintiff, on the other hand, argues that the payments fall under the definition of rent in the Single Business Tax Act because Fox retained ownership of the tapes and, therefore, plaintiff never acquired legal or equitable title. Plaintiff further notes that its duty to make payments was not based on actual use, but the right to use them "much like the duty to make rental payments for an apartment or a piece of equipment does not depend upon actually occupying the premises or using the equipment for its intended purpose, but having the right to do so." Plaintiff also argues that the definitions applied in *Mobil Oil Corp* and *Detroit Lions, Inc,* emphasized that royalties are payments based upon a percentage or share of the revenue or income generated by one's actual use of the property rather than the fixed monthly installments involved here. Finally, plaintiff analogizes its situation to the one where an individual rents a copyrighted videotape from a store.

We believe that the payments made in this case were royalties. In *Rohmer v Comm'r of Internal Revenue,* 153 F2d 61, 62-63 (CA 2, 1946), cert den 328 US 862; 66 S Ct 1367; 90 L Ed 1632 (1946), the court held that, where a copyright owner transfers substantially less than the entire bundle of rights conferred by the copyright, payment therefor, whether in one sum or in several payments, consti-

tutes a royalty. See also *Comm'r of Internal Revenue v Affiliated Enterprises, Inc,* 123 F2d 665, 668 (CA 10, 1941), cert den 315 US 812; 62 S Ct 796; 86 L Ed 1211 (1942). The court noted that such a transfer is a license. *Rohmer, supra.* These holdings were based on a concept known as indivisibility under the Copyright Act of 1909. See generally 3 Nimmer on Copyright, § 10.01[A], pp 10-4 and 10-5. This terminology continues under the Copyright Act of 1976, but the consequences of whether something is an assignment or an exclusive license are largely altered. *Id.,* §§ 10.02[A] and [B], pp 10-20 through 10-25. While not owning the copyright, an exclusive licensee acquires ownership of the rights conveyed by the license. *Id.*

A copyright owner has the following exclusive rights in his copyrighted work: (1) the right to reproduce the copyrighted work, (2) the right to prepare derivative works based upon the copyrighted work, (3) the right to distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending, (4) in the case of motion pictures and audiovisual works, the right to perform the copyrighted work publicly, and (5) the right to display the copyrighted work publicly. 17 USC 106. Conversely, the copyright owner has the right to exclude others from exercising these rights. 18 Am Jur 2d, Copyright and Literary Property, § 70, p 413. We note that in *Total Petroleum, Inc v Dep't of Treasury,* 170 Mich 417, 428; 427 NW2d 639 (1988), lv den 432 Mich 856 (1989), this Court recognized that taxation under the Single Business Tax Act is appropriate because of the privilege of retaining the property to the exclusion of other potential competitors. Here, Fox granted plaintiff an exclusive license to publicly perform its copy-

righted work under the terms contained therein. Hence, the facts that plaintiff paid a lump sum in monthly installments and did not have to show the episodes did not convert what were royalties into rent under the above-discussed cases and principles.

Moreover, plaintiff's analogy to an individual's rental of a videotape cassette is inappropriate. A videotape store owner purchases the copyrighted material and the copyright owner thereby waives his right of distribution held in those particular copies sold and not in any of his other rights. See *Columbia Pictures Industries, Inc v Redd Horne, Inc,* 749 F2d 154 (CA 3, 1984). Hence, the videotape store owner is the lawful owner of the copy and may sell or otherwise dispose of it without the authority of the copyright owner. 17 USC 109(a).

Reversed.