Murphy, J.
 

 In these consolidated appeals, petitioner Columbia Associates, L.P. (Columbia), appeals as of right, in Docket No. 222513, from a judgment by the Tax Tribunal that affirmed a deficiency assessment of single business taxes in the amount of $311,153, plus
 
 *660
 
 $78,828 in interest, for a total of $389,981. We affirm. In Docket No. 235810, defendant Department of Treasury appeals as of right from a judgment by the Court of Claims that ordered defendant to refund to plaintiff Four Flags Cablevision (Four Flags) a deficiency assessment of single business taxes in tire amount of $11,054, plus $1,225 in interest, which had previously been paid to defendant under protest.
 
 [1]
 
 Four Flags was also allowed to recover $805,350 in business loss carry-forward for calendar year 1992. We reverse.
 

 I. BASIC FACTS
 

 These cases arise out of disputes over plaintiffs’ single business tax liability. Specifically, these cases address whether certain network affiliation fees that plaintiffs paid for programming should be characterized under the Single Business Tax Act (SBTA), MCL 208.1
 
 et seq.,
 
 as “royalties” that defendant required plaintiffs to add back to their tax bases for the years 1989-91 with respect to Four Flags, and 1992 with respect to Columbia.
 

 The facts in these cases are uncontested. In the proceedings below, the parties submitted joint stipulations of facts. In Docket No. 222513, the parties also filed a joint supplemental stipulation of facts. Columbia is a cable television system operator organized as a Delaware limited partnership, with its principal office in Greenwich, Connecticut. Four Flags is also a cable television system operator organized as a Michi
 
 *661
 
 gan partnership, with its principal place of business in Denver, Colorado. During the tax years in issue, plaintiffs operated cable television systems in Michigan.
 

 By virtue of authority granted to them by local authorities under franchise agreements, plaintiffs constructed and operated systems for delivering cable television services to franchise-area residents. Plaintiffs’ cable services encompass a wide range of programming, including over-the-air broadcast television stations, public access channels, cable programming satellite services (such as ESPN and CNN), and premium services (such as HBO and Showtime). The programming that plaintiffs acquire largely mirrors that provided by other cable television systems and other multichannel video distribution services.
 

 During the years in issue, plaintiffs entered into affiliation agreements with several satellite programming networks. Under these agreements, plaintiffs paid affiliation fees to the networks in exchange for programming packages that plaintiffs distributed by way of their cable television systems. To the extent plaintiffs pay a fee for network programming, they generally pass that fee along to their subscribers by increasing the rate that subscribers pay to receive cable television service.
 

 In July 1986, defendant issued a written internal policy statement regarding the sbta treatment of cable operators’ affiliation fees. The policy statement provided, in pertinent part:
 

 2. Payments made under network affiliation agreements between hbo or Showtime and a local cable operator are “rents” not “royalties” for purposes of the sbt. This finding
 
 *662
 
 is based upon our review of a sample agreement and finds support in Revenue Ruling 54-284 1954-2 C. B. 275.
 
 [2]
 

 Defendant’s audit division followed this policy statement from its issuance until this Court’s decision in
 
 Field Enterprises v Dep’t of Treasury,
 
 184 Mich App 151; 457 NW2d 113 (1990), which we will discuss later, along with additional pertinent facts as they relate to the issues presented.
 

 H. PROCEDURAL HISTORY
 

 A. DOCKET NO. 222513
 

 Columbia timely filed single business tax returns for each of the tax years 1992 through 1994. Defendant subsequently conducted a field audit of plaintiff covering those years. Defendant determined that payments Columbia made pursuant to network affiliation agreements had to be added back to its single business tax base. As a consequence, defendant issued to Columbia a bill for taxes due (intent to assess), alleging Columbia’s liability for additional single business tax in the amount of $311,153, plus $78,828 in interest, for a total alleged liability of $389,981. Columbia paid the total amount under protest. Defendant states in its appellate brief that in the audit at issue here, it added back royalties only for 1992, even though the audit covered the tax years 1992 through 1994. Columbia apparently does not dispute the dates. We will discuss this matter in more detail below as it relates to MCL 208.9(4)(g)(vi).
 

 
 *663
 
 After making the tax payments under protest, Columbia subsequently filed a petition in this matter. While preparing a response to Columbia’s petition, defense counsel was incorrectly informed by a tax division staff member that defendant’s 1986 policy statement remained in effect. On May 5, 1997, defense counsel contacted Columbia’s counsel to request an extension to file a response. During that conversation, the attorneys agreed to settle Columbia’s claim, with defense counsel agreeing that defendant would refund all amounts Columbia had paid under protest. Before the conversation with Columbia’s counsel, defense counsel had not discussed settlement of the matter with defendant or Attorney General staff members. Defense counsel maintained that he did not have authority to settle the case on behalf of defendant and that defendant’s staff member with whom he spoke about the 1986 policy statement likewise lacked authority to settle the case. Further, it is argued that defense counsel did not have authority to settle the case on behalf of the Attorney General without approval of the Deputy Attorney General or his designee.
 

 On August 4, 1997, Columbia’s counsel prepared and sent to defense counsel a draft settlement proposal reflecting the terms agreed on. Defense counsel then informed Columbia’s counsel that defendant did not agree to any settlement. The settlement agreement was never reduced to a writing signed by defendant or defense counsel or placed on the record.
 

 On September 10, 1999, the Tax Tribunal issued a ruling affirming defendant’s deficiency assessment against Columbia and finding that the parties had not settled the case. The Tax Tribunal concluded that the
 
 *664
 
 affiliation fees constituted royalties. This appeal followed.
 

 B. DOCKET NO. 235810
 

 Four Flags timely filed single business tax returns for calendar years 1989 through 1991. Defendant subsequently conducted a field audit of Four Flags covering the years in dispute, and it issued a bill for taxes due (intent to assess) on November 6, 1996, asserting Four Flags’ liability for additional single business tax in the amount of $29,168, plus $11,936 in interest and a penalty of $2,917, for a total liability of $44,021. The bill for taxes due was based on several factors, including defendant’s determination that Four Flags’ programming costs were royalty expenses.
 

 Four Flags challenged the bill for taxes due, and on July 16, 1999, the Commissioner of Revenue issued a decision and order of determination providing Four Flags some relief, but no relief regarding defendant’s decision that the programming fees were royalty payments. As a result of the order, the original bill for taxes due was canceled, but Four Flags’ business loss carry-forward from calendar year 1991 was reduced by $805,350. On August 4, 1999, defendant issued a bill for taxes due (final assessment) regarding calendar year 1997, which assessed single business tax liability of $11,054 and interest of $1,225. This assessment was a consequence of the determination that the affiliation fees paid to networks by Four Flags from 1989-91 constituted royalties. Four Flags paid the amount under protest, then initiated this lawsuit in the Court of Claims to modify the $805,350 in business loss carry-forward and to challenge the $12,279 paid under protest for calendar year 1997.
 

 
 *665
 
 On June 21, 2001, the Court of Claims issued an opinion and order finding that Four Flags’ programming costs were not royalties under the SBTA because the fees were not paid directly to the copyright owner of materials carried on the satellite programming networks. The Court of Claims issued a final order on July 10, 2001, ordering defendant to refund the amount paid under protest, with statutory interest, and to reinstate Four Flags’ business loss carry-forward from calendar year 1991. This appeal followed.
 

 ffl. ANALYSIS
 

 A. STANDARD OF REVIEW
 

 This Court’s review of Tax Tribunal decisions is very limited.
 
 Michigan Milk Producers Ass’n v Dep’t of Treasury,
 
 242 Mich App 486, 490; 618 NW2d 917 (2000). On appeal, absent a claim of fraud, this Court can determine only whether the tribunal committed an error of law or adopted a wrong legal principle.
 
 Id.
 
 at 490. Factual findings that are supported by competent, material, and substantial evidence on the whole record will not be disturbed on appeal.
 
 Id.
 
 at 490-491. In general, when a case is submitted to a governmental agency on stipulated facts, as occurred here, those facts are to be taken as conclusive.
 
 Farrimond v East Jordan Public Schools Bd of Ed,
 
 138 Mich App 51, 56; 359 NW2d 245 (1984).
 

 This case involves statutory interpretation of the SBTA. Statutory interpretation concerns a question of law that this Court reviews de novo.
 
 Milk Producers, supra
 
 at 491. The primary goal of statutory interpretation is to determine the intent of the Legislature as
 
 *666
 
 discerned from the language in the particular statute and give effect to that intent.
 
 Id.
 
 Where a statute is clear and unambiguous, judicial construction is neither appropriate nor permitted, and the language contained in the statute must be read according to its ordinary and generally accepted meaning.
 
 Id.
 
 In general, this Court will defer to the Tax Tribunal’s interpretation of a statute that the tribunal administers and enforces.
 
 Id.
 
 Tax laws are generally construed against the government.
 
 Auto-Owners Ins Co v Dep’t of Treasury,
 
 226 Mich App 618, 621; 575 NW2d 770 (1997).
 

 B. THE SINGLE BUSINESS TAX
 

 Pursuant to MCL 208.31(3), the single business tax is imposed on the privilege of doing business in Michigan and does not constitute an income tax.
 
 Guardian Photo, Inc v Dep’t of Treasury,
 
 243 Mich App 270, 277; 621 NW2d 233 (2001). “The single business tax represents a value added tax
 
 [3]
 
 that measures the increase in value of goods and services brought about by whatever a business does to them between the time of purchase and time of sale.”
 
 Id.
 
 The tax is on
 
 *667
 
 what a business has added to the Michigan economy, not on what the business has derived from this state’s economy.
 
 Id.
 

 Pursuant to MCL 208.31(1), the single business tax is levied and imposed on “the adjusted tax base of every person with business activity in this state that is allocated or apportioned to this state . . . .” The tax base “means business income,
 
 [4]
 
 before apportionment or allocation as provided in chapter 3, even if zero or negative, subject to the adjustments in subsections (2) to (9).” MCL 208.9(1). At issue here is the adjustment for royalties.
 

 MCL 208.9 provides in relevant part:
 

 (4) Add the following, to the extent deducted in arriving at federal taxable income:
 

 (g) All royalties except for the following:
 

 * * *
 

 (vi) Royalties, fees, charges, or other payments or consideration paid or incurred by radio or television broadcasters for program matter or signals.
 

 At issue in the present case is whether the affiliation fees paid to networks in the years 1989-92 constituted royalty payments, which were required to be added to the tax base in determining the single business tax. MCL 208.9(4)(g)(vi) was not part of the stat
 
 *668
 
 ute during the relevant years, and it was added through a 1993 amendment. 1993 PA 105.
 
 [5]
 

 C. ENFORCEABILITY OF SETTLEMENT AGREEMENT (DOCKET NO. 222513)
 

 Columbia sought to enforce the settlement offer made below by defense counsel, and the Tax Tribunal rejected Columbia’s argument, finding that there had been no “meeting of the minds.” On appeal, Columbia argues that defense counsel admitted that he made a settlement offer, that the subsequent denial of the settlement was ineffective because there had been a meeting of the minds, and that defendant simply had a change of heart. Columbia further argues that while defense counsel’s settlement offer was not made in writing or placed on the record, the oral agreement is enforceable. We hold that the Tax Tribunal did not err in finding that there was no enforceable settlement agreement.
 

 This Court has stated that an agreement to settle a pending lawsuit constitutes a contract, and therefore the agreement is governed by legal principles applicable to the interpretation and construction of contracts.
 
 Michigan Mut Ins Co v Indiana Ins Co,
 
 247 Mich App 480, 484; 637 NW2d 232 (2001). A settlement agreement will not be enforced even if it fulfills the requirements of contract principles where the agreement does not additionally satisfy the require
 
 *669
 
 ments of MCR 2.507(H).
 
 Michigan Mut, supra
 
 at 484-485. MCR 2.507(H) provides:
 

 An agreement or consent between the parties or their attorneys respecting the proceedings in an action, subsequently denied by either party, is not binding unless it was made in open court, or unless evidence of the agreement is in writing, subscribed by the party against whom the agreement is offered or by that party’s attorney.
 

 The parties do not dispute that a settlement agreement was not made in open court and that there was no evidence of a written agreement signed by defendant or defense counsel. A review of the record indicates that although defense counsel may have offered to settle the case, there was no agreement by defendant to settle the matter, and defendant subsequently denied that a settlement agreement had been reached. According to the affidavit of defense counsel, defendant’s staff employee simply indicated that the 1986 policy regarding affiliation fees remained effective; however, the affidavit does not state that the staff employee authorized a settlement, nor is there evidence establishing that the staff employee had authority to settle the case. This presents us with a situation where, under MCR 2.507(H), there has been a settlement agreement between defense counsel and plaintiff, which defense counsel has not denied, but where defendant denied any agreement, although its counsel had apparent authority to act on defendant’s behalf.
 
 [6]
 
 In light of the affidavit, which was not contradicted,
 
 *670
 
 defense counsel did not have actual authority to settle the case.
 

 In
 
 Nelson v Consumers Power Co,
 
 198 Mich App 82, 90; 497 NW2d 205 (1993), this Court stated:
 

 [W]e hold that pursuant to MCR 2.507(H), an agreement between
 
 counsel
 
 to settle a case, subsequently denied by either
 
 party,
 
 is not binding under principles of apparent authority unless the settlement was made in open court, or unless evidence of the agreement is in writing, subscribed by the party against whom the agreement is offered or by that party’s attorney. [Emphasis added.]
 

 Here, defendant denied the existence of any settlement agreement entered into by its attorney; therefore, because the agreement was not made in open court or reduced to writing, any settlement agreement was not binding on defendant.
 

 D. WHETHER AFFILIATION FEES PAID DURING THE YEARS 1989-92 CONSTITUTED ROYALTIES
 

 The Tax Tribunal did not err in finding that Columbia’s network affiliation fees were royalty payments under the sbta, but the Court of Claims erred in reaching the opposite conclusion regarding Four Flags. The fees fit the definition of a royalty that our Supreme Court enunciated in
 
 Mobil Oil Corp v Dep’t of Treasury,
 
 422 Mich 473, 484-485; 373 NW2d 730 (1985). Also, this Court’s decision in
 
 Field Enterprises, supra,
 
 which held that television syndication fees are royalties, applies to these cases and, thus, had the effect of invalidating defendant’s 1986 policy statement concerning payments made by local cable operators under network affiliation agreements.
 

 
 *671
 
 (1) PLAINTIFFS’ ARGUMENTS
 

 Plaintiffs present myraid arguments in support of their positions, most of which overlap. We see no need to identify the particular proponent of any given argument, because all the arguments assert that the affiliation fees are not royalties; therefore, we shall simply reference the arguments as being presented by “plaintiffs.”
 

 Plaintiffs argue that the principles found in
 
 Mobil Oil
 
 and
 
 Field Enterprises
 
 do not apply to cable operators because of numerous distinguishing factors that we will discuss in detail below; therefore, according to plaintiffs, the affiliation fees cannot constitute royalties. Plaintiffs further argue that the doctrine of legislative acquiescence should be utilized in construing the term “royalty,” as used in the SBTA, in favor of plaintiffs. Plaintiffs maintain that the term “royalties,” as defined in case law, is not a correct classification for the network affiliation fees. Plaintiffs assert that under the general rule of statutory construction concerning ambiguous terms, any resolution should be made against the government.
 

 Plaintiffs additionally argue that the 1986 policy is required to be followed because it was never revoked, because there was no notice to cable operators that it was no longer being implemented, because the policy constituted a “guideline” that bound defendant pursuant to MCL 24.203(6) of the Administrative Procedures Act (apa), MCL 24.201
 
 et seq.,
 
 and because there would be violations of due process and equal protection should it not be enforced.
 

 Finally, plaintiffs argue that if the affiliation fees are royalties, then the payments made by their sub
 
 *672
 
 scribers for cable services are also royalty payments that cable operators can deduct from their tax base, thereby offsetting any negative tax consequence. We shall begin with addressing the
 
 Mobil Oil
 
 and
 
 Field Enterprises
 
 decisions.
 

 (2)
 
 MOBIL OIL COUP v DEP’T OF TREASURY
 

 The sbta lists certain items that are not treated as royalties under the act, but does not otherwise define a royalty. MCL 208.9(4)(g). In
 
 Mobil
 
 Oil,
 
 supra
 
 at 484, a case addressing the treatment of provisions in oil and gas leases under the sbta, our Supreme Court relied on the common usage of the word to determine its meaning, and it relied on
 
 The Random House College Dictionary
 
 (rev ed), p 1150, which defined “royalty” as:
 

 “[A] compensation or portion of the proceeds
 
 paid
 
 to the owner of a right, as a patent or oil or mineral right, for the use of it... an agreed portion of the income from a work paid to its author, composer, etc., usually a percentage of the retail price of each copy sold ... a royal right, as over minerals, granted by a sovereign to a person or corporation . . . the payment made for such a right.” [Omissions, emphasis, and alteration made in
 
 Mobile Oil.]
 

 The Supreme Court further relied on Black’s Law Dictionary (5th ed), p 1195, which defined “royalty” as:
 

 “Compensation for the use of property, usually copyrighted material or natural resources, expressed as a percentage of receipts from using the property or as an account per unit produced. A payment which is made to an author or composer by an assignee, licensee or copyright holder in respect of each copy of his work which is sold, or to an investor in respect of each article sold under the pat
 
 *673
 
 ent. Royalty is share of product or profit reserved by owner for permitting another to use the property .... In mining and oil operations, a share of the product or profit
 
 paid
 
 to the owner of the property.”
 
 [Mobil Oil, supra
 
 at 484 (omission and emphasis made in
 
 Mobile Oil).]
 

 The
 
 Mobil Oil
 
 Court concluded that the portion of oil and gas receipts received by the operator-lessee that were given over to the landowner-lessor of the land on which the oil and gas was extracted must be added to the single business tax base of the operator-lessee because the payments constituted royalties for purposes of the sbta.
 
 Id.
 
 at 499.
 

 The
 
 Mobil Oil
 
 definition makes clear that royalties have three key characteristics: “(1) it is a payment, (2) in the form of either the product itself or proceeds from the sale of the product, and (3) made in consideration for the use of the property.”
 
 Michigan United Conservation Clubs v Dep’t of Treasury,
 
 239 Mich App 70, 79; 608 NW2d 141 (1999), aff’d by equal division 463 Mich 995; 625 NW2d 783 (2001). The network affiliation fees clearly match these qualities. First, the fees constitute payments from the cable operators to the networks. Second, the cable operators make the payments in the form of proceeds from the sale of cable packages to consumers. Finally, the cable operators pay the networks in consideration for the use of the networks’ programming.
 

 In addition, the network affiliation fees constitute payment for the use of copyrighted material, bringing the fees directly within the Black’s Law Dictionary definition the Supreme Court relied on in
 
 Mobil Oil.
 
 The sample network affiliation agreement makes this clear. The agreement states, in part:
 

 
 *674
 
 3(c) Affiliate shall not itself, and shall not authorize others to, copy, tape or otherwise reproduce any part of the * Service without *‘s prior written authorization. . . . Affiliate shall itself not distribute or exhibit, and shall not authorize, license or permit the distribution or exhibition of, the * Service by any means or devices now known or hereafter devised other than throughout the Cable Television System(s) listed in Schedule A hereto (as such Schedule may be amended from time to time) in accordance with the terms of this Agreement.
 

 * * *
 

 6(c) * will indemnify Affiliate from and against any and all claims, liabilities, costs and expenses arising out of the distribution, pursuant to this Agreement, of the * Service to the extent that such claims, damages, liabilities, costs and expenses are: (i) based upon . . . violation or infringement of copyright (other than music performance rights) or literary or dramatic rights arising out of the content of the * Service .... [A single asterisk has been substituted for the name of the network.]
 

 Further, the network affiliation agreements provide that the amount plaintiffs must pay to a network depends on the number of subscribers to plaintiffs’ cable service. Thus, the network affiliation fees are akin to payments made to authors, composers, or inventors based on the number of units sold.
 
 Mobil Oil, supra
 
 at 484.
 

 (3)
 
 FIELD ENTERPRISES v DEP’T OF TREASURY
 

 This Court addressed the characterization of programming costs in
 
 Field Enterprises, supra.
 
 In
 
 Field, supra
 
 at 152, Twentieth Century-Fox Television Corporation (Fox) granted the plaintiff, a local television broadcaster, a limited exhibition license to show 197
 
 M*A*S*H
 
 videotapes on its WKBD-TV station. Under
 
 *675
 
 the license, plaintiff was allowed to show each video up to six times in the six-year license period.
 
 Id.
 
 The plaintiff paid Fox a straight fee of $797,600, payable in monthly installments, which payments were required regardless of whether
 
 M*A*S*H
 
 was telecast or not.
 
 Id.
 
 at 152-153. The plaintiff was not permitted to sublicense or relicense episodes or make copies of the videotapes.
 
 Id.
 
 at 153. Fox agreed not to license episodes to other stations in the market or cable companies in a particular geographic zone.
 
 Id.
 
 Fox retained all rights, title, and interest in the episodes, and the telecasts of the episodes were required to include Fox’s copyright notice.
 
 Id.
 

 The
 
 Field Enterprises
 
 panel began its determination whether the payments made to Fox for the
 
 M*A*S*H
 
 episodes constituted royalties under the SBTA by citing the dictionary definitions found in
 
 Mobil Oil. Field Enterprises, id.
 
 at 154-155. This Court then cited
 
 Detroit Lions, Inc v Dep’t of Treasury,
 
 157 Mich App 207, 219; 403 NW2d 812 (1986), for the proposition that a royalty transaction involves payments to a copyright holder for the right to use the subject of that copyright.
 
 Field Enterprises, supra
 
 at 156. However, the
 
 Field Enterprises
 
 panel noted that the
 
 Detroit Lions, Inc,
 
 panel stated that the existence of a copyright is not crucial to the finding that a royalty was involved and that the nature of the transaction must be examined.
 
 Id.
 
 This Court further noted the following with agreement:
 

 Moreover, defendant notes that the agreement between plaintiff and Fox was a license which this Court described as a transaction which produced royalties in
 
 Detroit Lions, Inc, supra,
 
 pp 216-217. Defendant also notes that 26 USC 543(a)(4) defines copyright royalties as “compensation,
 
 *676
 
 however designated, for the use of, or the right to use, copyrights in works protected by copyright issued under title 17 of the United States Code . . .
 
 [Field Enterprises, supra
 
 at 157 (omission in
 
 Field Enterprises).]
 

 The plaintiff argued that the payments to Fox were rent because Fox retained ownership of the episodes and the plaintiff never acquired legal or equitable title.
 
 Id.
 
 The plaintiff further argued that the payments were rent because the payments were based not on actual use of the videotapes, but simply on the right to use as comparable to renting an apartment or a piece of equipment.
 
 Id.
 
 The plaintiff continued the “rent” argument by asserting that royalties are payments based on the percentage of revenues derived or income generated by actual use rather than fixed installment payments.
 
 Id.
 
 Finally, the plaintiff argued that making payments for the
 
 M*A*S*H
 
 videotapes was like renting a videotape from a video store.
 
 Id.
 
 This Court rejected all the plaintiffs arguments.
 
 Id.
 
 at 157-159. The
 
 Field Enterprises
 
 panel held:
 

 We believe that the payments made in this case were royalties. In
 
 Rohmer v Comm’r of Internal Revenue,
 
 153 F2d 61, 62-63 (CA 2, 1946), cert den 328 US 862; 66 S Ct 1367; 90 L Ed 1632 (1946), the court held that, where a copyright owner transfers substantially less than the entire bundle of rights conferred by the copyright, payment therefor, whether in one sum or in several payments, constitutes a royalty. See also
 
 Comm’r of Internal Revenue v Affiliated Enterprises, Inc,
 
 123 F2d 665, 668 (CA 10, 1941), cert den 315 US 812; 62 S Ct 796; 86 L Ed 1211 (1942). The court noted that such a transfer is a license.
 
 Rohmer, supra. [Field Enterprises, supra
 
 at 157-158.]
 

 “While not owning the copyright, an exclusive licensee acquires ownership of the rights conveyed by
 
 *677
 
 the license.”
 
 Id.
 
 at 158. This Court concluded that “the facts that plaintiff paid a lump sum in monthly installments and did not have to show the episodes did not convert what were royalties into rent under the above-discussed cases and principles.”
 
 Id.
 
 at 159.
 

 Here, the facts appear to more strongly support a finding that the affiliation fees were royalties. The affiliation fees paid by plaintiffs, which were determined by the number of subscribers to plaintiffs’ cable systems, were based on actual use of network programming and not solely on the right to use the programming. In other words, the affiliation fees were based on income generated by actual use, which income, in part, was passed to the networks.
 

 Mobil Oil
 
 and
 
 Field Enterprises
 
 support a finding that the affiliation fees paid by plaintiffs to the networks were royalties under the SBTA subject to be added back to their respective tax bases. We shall now address an attempt by plaintiffs to distinguish
 
 Mobil Oil,
 
 and more specifically
 
 Field Enterprises;
 
 however, we are not persuaded.
 

 (4) PLAINTIFFS’ ATTEMPT TO DISTINGUISH CABLE OPERATOR PAYMENTS
 

 Plaintiffs first argue that the affiliation fees constitute “rental” payments under the SBTA. The basis for the argument is that plaintiffs were prohibited from using the network programming other than in the manner prescribed in the affiliation agreements, that plaintiffs had no control over the content and the timing of the programming carried on the networks, and that plaintiffs were simply distributing programming services without acquiring any rights associated with copyright ownership. Plaintiffs’ arguments lack merit.
 

 
 *678
 
 We initially note that although plaintiffs point out these allegedly distinguishing characteristics, plaintiffs fail to explain with supporting authority why these characteristics should result in a finding contrary to the holding in
 
 Field Enterprises,
 

 [7]
 

 In
 
 Mudge v Macomb Co,
 
 458 Mich 87, 105; 580 NW2d 845 (1998), our Supreme Court, quoting
 
 Mitcham v Detroit,
 
 355 Mich 182, 203; 94 NW2d 388 (1959), stated:
 

 “It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow.”
 

 Regardless, plaintiffs’ arguments concerning any distinctions fail. Concerning lack of control over the programming content carried by the networks, we first note that the networks are required to make available to plaintiffs, under the affiliation agreements, local commercial announcement time controlled by plaintiffs within the parameters of the agreement. Moreover, we see no reason why plaintiffs’ lack of control over network programming content dictates a finding that the affiliation fees were not royalties, and plaintiffs cite no authority in support of their proposition. The
 
 Mobil Oil
 
 definitions of a royalty contain no requirement that a party have the right to modify the content of the copyrighted or otherwise protected property or to use the property in
 
 *679
 
 any manner desired. In fact, in
 
 Field Enterprises, supra
 
 at 152, Fox limited the telecasting of the
 
 M*A*S*H
 
 videos to six times in the six-year license period.
 

 Regarding plaintiffs’ argument concerning the prohibition against using the material other than in the manner provided in the affiliation agreement, the television broadcaster in
 
 Field Enterprises
 
 was also so limited. Plaintiffs’ broad general claim that they were “prohibited from using any of the trademark or copyrighted material” is baseless, inasmuch as the copyrighted material was presented or used on plaintiffs’ cable systems for a commercial purpose from which plaintiffs profited. Plaintiffs were simply barred from copying, taping, licensing, distributing, or reproducing any part of the network programming as in
 
 Field Enterprises.
 

 Regarding plaintiffs’ claim that they were merely distributing programming without acquiring rights associated with copyright ownership, it is clear that plaintiffs acquired the right, through the affiliation agreements, to distribute network programming through their cable systems, just as the television broadcaster in
 
 Field Enterprises
 
 acquired only the right to present
 
 M*A*S*FL
 
 episodes on its local television station.
 

 Plaintiffs argue that the affiliation fees are not paid directly to copyright owners and that the networks pay royalties to the appropriate person or entity for the specific programs presented on the network. However, plaintiffs concede that the networks also present original programming for which the networks hold copyrights. Additionally, as noted in
 
 Field Enterprises, supra
 
 at 156, the existence of a copyright is
 
 *680
 
 not required in order to conclude that a payment is a royalty. Moreover, plaintiffs’ argument is flawed because it focuses on the rights held in individual programs carried by a network as opposed to the network as a whole. It is clear from the affiliation agreements that the fees are being paid to networks not for the rights to show specific programs, but for the right to place the network on their cable systems. It is beyond dispute that the networks hold protected rights controlling the display of their networks, otherwise affiliation agreements would be unnecessary. Plaintiffs pay for the right to display CNN, ESPN, and other networks through their cable systems, and those payments are clearly royalties, or, in other words, compensation paid for the use of protected materials.
 

 Even if a network does not hold the original copyright to a particular program, it is evident that it has obtained the right through licensing agreements to carry the program on its network, and the network then allows plaintiffs to utilize those rights. Neither the
 
 Mobil Oil
 
 Court nor the
 
 Field Enterprises
 
 panel indicated that payments must be made to the
 
 original
 
 copyright owner in order for the payments to be considered royalties under the sbta. Therefore, plaintiffs paid fees to the owner of the right to distribute copyrighted materials, and plaintiffs then added value to those materials that was properly taxed under the SBTA.
 

 Plaintiffs next argue that, as opposed to the television broadcaster in
 
 Field Enterprises,
 
 cable system operators do not acquire proprietary rights to retransmit programming to the exclusion of competitors. First, there is no basis in the case law that exclusivity
 
 *681
 
 is required before finding that a particular payment constitutes a royalty. The
 
 Mobil Oil
 
 definitions of royalty do not contain any such requirement. In fact, such a requirement would be illogical. For example, if two in-town radio stations paid a musician for each time the stations played the musician’s copyrighted music on the air, the payments would not constitute royalties according to plaintiffs’ theory of exclusivity; however, if only one radio station had the right to play the music, the payment to the musician would be a royalty payment. We cannot interpret the sbta in a way that would lead to an absurd result.
 
 Camden v Kaufman,
 
 240 Mich App 389, 395; 613 NW2d 335 (2000). Concerning plaintiffs’ argument regarding proprietary rights to retransmit programming, plaintiffs are correct in stating that the affiliation agreement contains language that provides that plaintiffs have no proprietary rights, but the language is in the context of the network estabhshing that the programming is its exclusive property and that it is the owner of the programming, i.e., the proprietor. In
 
 Field Enterprises, supra
 
 at 153, Fox also retained all rights, title, and interest, and although the television broadcaster could retransmit the videotapes, it could not otherwise license or distribute the tapes. We see no reason to distinguish between the right to retransmit videotapes and the right to display network programming on cable systems in determining whether a royalty was involved, and plaintiffs provide no relevant explanation to the contrary.
 

 Plaintiffs next argue that the affiliation fees were for services and not just for the right to transmit satellite programming. As noted in
 
 Field Enterprises, supra
 
 at 156, we must examine the nature of the
 
 *682
 
 transaction, and here the nature of the transaction was that plaintiffs were paying for a product, i.e., cable satellite programming, and not for a service.
 

 Plaintiffs next argue that cable operators are simply distributors who acquire programming for resale to subscribers, which is different than the television broadcaster in
 
 Field Enterprises
 
 who acquired programming for over-the-air distribution. This distinction has absolutely no bearing on whether affiliation fees constitute royalty payments because in both situations the payment is made to the owner of a right for the use of a product regardless of whether the programming is distributed by cable operators on their cable systems or presented directly over the air.
 

 Plaintiffs further argue that a distinction should be made, in making a royalty determination, between situations where revenues received from subscribers are passed on to networks to cover affiliation fees and situations where television broadcasters themselves pay the owner of a particular program. This argument lacks merit because it mistakenly presupposes that television broadcasters are not using income derived from purchased programming to make royalty payments. It is beyond dispute, and plaintiffs concede, that television broadcasters derive advertising revenue from carrying programs on their stations and that a portion of the income is passed on to the owner of the program, such as Fox in
 
 Field Enterprises,
 
 for the right to air the program on the broadcaster’s television station. There is simply no reason to distinguish payments coming from subscribers and payments coming from advertisers in determining whether a royalty was paid where those payments ultimately are used by either the broadcaster or the
 
 *683
 
 cable operator to cover the costs of obtaining programming.
 

 Plaintiffs next assert that the entire cost of network programming is paid by subscribers through payments made to cable operators directly passed on to the networks; therefore, cable operators are not paying networks a portion of the profits they derive from the sale of cable programming to subscribers. Plaintiffs’ argument suggests that they are nearly an irrelevant entity and that the true transaction is between the subscribers and the networks. We find this position to be unfounded. Cable operators pay for satellite network programming in order to present those networks on their respective cable systems for which they receive payment from subscribers and make a profit. This is no different, in the context of making a royalty determination, than a television broadcaster paying for programming in order to present the programming on its television station for which it derives income and profits from advertisers. In both cases, the businesses (cable operators and television broadcasters) derive income from the presentation of purchased programming and portions of that income are passed to the supplier of the programming in order to obtain the right to distribute the programming with some of the remaining income being retained as a profit or to cover other costs. In both cases, the businesses produce a final product, i.e., a cable system with myriad networks or a television station with myriad programs, which was produced through a multitude of inputs (for cable system operators, CNN, ESPN, tbs, Nickelodeon, and so on, or for television broadcasters,
 
 M*A*S*H, Seinfeld, Cheers,
 
 and so on) that added value to the economy and thus are subject
 
 *684
 
 to taxation under the sbta.
 
 Mobil Oil, supra
 
 at 493. In no sense can cable system operators be deemed to be mere passive recipients of income, as the landowner-lessor in
 
 Mobil Oil,
 
 because cable operators are actively operating and maintaining a cable system that pulls together over-the-air broadcast television stations, public access channels, cable programming satellite networks, and premium channels for distribution to subscribers.
 

 Finally, plaintiffs argue that should the affiliation fees be deemed royalty payments, then the payments made by subscribers to plaintiffs are also royalty payments and, therefore, the subscriber income could be subtracted from the single business tax base, creating in essence a “wash.” We disagree. First, a subscriber is not obtaining any rights to use the programming in order to derive income, as is a cable operator, but merely is allowed to view the programming through the various cable packages made available by cable operators. Second, and in conjunction with our first point, the subscription payments to cable operators do not come from funds or proceeds derived from the use of network programming.
 

 All plaintiffs’ attempts to distinguish the television broadcaster in
 
 Field Enterprises
 
 and cable system operators fail, and the decision was equally applicable to cable operators.
 

 (5) LEGISLATIVE ACQUIESCENCE
 

 The doctrine of legislative acquiescence does not alter our finding that the network affiliation fees constituted royalties under the principles enunciated in
 
 Mobil Oil
 
 and
 
 Field Enterprises.
 
 Plaintiffs contend
 
 *685
 
 that the doctrine of legislative acquiescence should be utilized in construing the term “royalty.” Plaintiffs’ argument is premised on the following factual assertions: defendant through the 1986 policy construed the term “royalty” as not applying to affiliation fees paid by cable system operators to networks; the 1990
 
 Field Enterprises
 
 decision resulted in payments made by television broadcasters under a television syndication license agreement to be deemed royalties and not rents; the 1993 amendment of MCL 208.9 was the Legislature’s effort to “correct” the
 
 Field Enterprises
 
 decision; the 1993 amendment did not specifically reference cable operators because cable operators were already protected by the 1986 policy and the
 
 Field Enterprises
 
 decision only affected television broadcasters; and, the Legislature, in the face of the defendant’s construction through the 1986 policy, never amended the sbta to the contrary, although there had been four amendments of the sbta since 1986.
 
 [8]
 
 Plaintiffs conclude that the Legislature acquiesced to defendant’s 1986 policy; therefore, the term “royalty” should be construed in favor of plaintiffs because the acquiescence indicated the Legislature’s intent that
 
 *686
 
 network affiliation fees not constitute royalties. In further support of their position, plaintiffs cite the bill analysis for the 1993 amendment, which indicates that the Legislature desired to have television broadcasters treated the same as cable operators.
 

 Legislative acquiescence presumes that the Legislature acted with knowledge of previous statutory interpretations. See
 
 Crown Technology Park v D&N Bank, FSB,
 
 242 Mich App 538, 551; 619 NW2d 66 (2000). In
 
 Donajkowski v Alpena Power Co,
 
 460 Mich 243, 261; 596 NW2d 574 (1999), our Supreme Court stated: “If it has not been clear in our previous decisions, we wish to make it clear now: legislative acquiescence’ is a highly disfavored doctrine of statutory construction; sound principles of statutory construction require that Michigan courts determine the Legislature’s intent from its
 
 words,
 
 not from its silence.”
 
 [9]
 
 (Emphasis in original.)
 

 “Legislative acquiescence is an exceedingly poor indicator of legislative intent.”
 
 Id.
 
 at 258. On the basis of the overwhelming disfavor of legislative acquiescence, the clear direction provided in
 
 Field Enterprises,
 
 and the fact that the Legislature involved in the 1993 amendment was not the same that was involved in enacting the SBTA, we believe that it would
 
 *687
 
 be improper to apply the doctrine here. Additionally, this Court has held that because internal policy statements are not promulgated under the Administrative Procedures Act notice and publication requirements, it “cannot reasonably be presumed that the Legislature was aware of and acquiesced to the statement.”
 
 Lyon Development Co v Dep’t of Natural Resources,
 
 157 Mich App 190, 197; 403 NW2d 78 (1986).
 

 Plaintiffs’ further reliance on House Legislative Analysis; HB 4857, June 17, 1993, in support of the legislative acquiescence argument fails for the reasons stated above and because legislative analysis is an inefficient tool in determining legislative intent. “[I]n Michigan, a legislative analysis is a feeble indicator of legislative intent and is therefore a generally unpersuasive tool of statutory construction.”
 
 Frank W Lynch & Co v Flex Technologies, Inc,
 
 463 Mich 578, 587; 624 NW2d 180 (2001). “The pr oblem with relying on bill analyses is that they do not necessarily represent the views of even a single legislator.”
 
 Id.
 
 at 588, n 7.
 

 (6) STATUTORY AMBIGUITIES
 

 Columbia contends that the Tax Tribunal erred in failing to resolve a tax statute ambiguity in favor of the taxpayer. Indeed, “ambiguities in the language of a tax statute are to be resolved in favor of the taxpayer.”
 
 Michigan Bell Telephone Co v Dep’t of Treasury,
 
 445 Mich 470, 477; 518 NW2d 808 (1994). However, we have resolved this dispute by applying the ordinary and generally accepted meaning of the term “royalty,” as outlined in
 
 Mobil Oil
 
 and
 
 Field Enterprises-,
 
 therefore, we cannot state that the term is necessarily ambiguous. Moreover, it is clear that the
 
 *688
 
 appellate courts inteipreting the term “royalty” in the context of the sbta have not ruled in favor of taxpayers on the basis of ambiguity, as is evident in the contrary finding in
 
 Field Enterprises.
 

 (7) STATUS OP THE 1986 POLICY
 

 We are cognizant of the fact that some of the network affiliation fees at issue predated the
 
 Field Enterprises
 
 decision and were paid at the time the 1986 policy was in place; however, it is a well-recognized principle of law that “[a]n administrative rule cannot exceed the statutory authority granted by the Legislature.”
 
 William Mueller & Sons, Inc v Dep’t of Treasury,
 
 189 Mich App 570, 574; 473 NW2d 783 (1991), citing
 
 Michigan Sportservice, Inc v Comm’r of Dep’t of Revenue,
 
 319 Mich 561, 566; 30 NW2d 281 (1948). Regardless of whether the 1986 policy constituted a rule, guideline, or interpretative statement or policy, it was contrary to law and exceeded defendant’s authority under the SBTA; therefore, it was unenforceable.
 

 We also believe that
 
 Field Enterprises
 
 should be applied retroactively. “Judicial decisions generally are given full retroactive effect. Prospective application is appropriate, however, when the holding overrules settled precedent or decides an issue of first impression whose resolution was not clearly foreshadowed.”
 
 Holmes v Michigan Capital Medical Center,
 
 242 Mich App 703, 713; 620 NW2d 319 (2000). However, the addressing of a matter of first impression does not in and of itself justify only prospective application of the decision where the case does not announce a new rule of law but merely provides an interpretation that has not previously been the subject of an appellate
 
 *689
 
 court decision.
 
 Id.
 
 We think it appropriate to apply
 
 Field Enterprises
 
 retroactively because it simply interpreted the SBTA. Moreover, the
 
 Mobil Oil
 
 decision was rendered before the 1986 policy became effective, and the affiliation fees fell within the royalty definitions provided in that case. We especially believe that it is appropriate to enforce the proper interpretation of the sbta, where taxes owed under the law are used for the benefit of the populace. Therefore, any relevant affiliation fees paid to the networks by plaintiffs before and after
 
 Field Enterprises
 
 qualified as “royalty” payments under the sbta.
 

 Concerning plaintiffs’ arguments regarding proper notice, due process, and equal protection, as those terms relate to the 1986 policy, plaintiffs fail to elaborate and support the argument with authority. Therefore, we will not address the matters inadequately raised by plaintiffs.
 
 Mudge, supra
 
 at 105.
 

 Finally, in light of our holding, we conclude that the Tax Tribunal did not err in failing to award damages to Columbia, because defendant did not intentionally and recklessly disregard “a provision of a law, rule, or written guideline or procedure of the department in connection with the determination, collection, or refund of a tax, interest, or penalty under” the SBTA. MCL 205.7.
 

 IV. CONCLUSION
 

 The relevant affiliation fees paid by plaintiffs constituted royalties for purposes of the sbta. Therefore, in Docket No. 222513, we affirm in full the judgment of the Tax Tribunal, in which the tribunal upheld the single business tax deficiency assessment against
 
 *690
 
 Columbia in the amount of $311,153, plus $78,828 in interest, for a total of $389,981. In Docket No. 235810, we reverse in full the judgment of the Court of Claims, in which defendant was ordered to refund to Four Flags the single business tax assessment in the amount of $12,279 with statutory interest and to restore plaintiffs single business tax loss carry-forward of $805,350.
 

 Affirmed in part and reversed in part. We do not retain jurisdiction.
 

 [1]
 

 In this opinion, we will refer to the Department of Treasury as defendant, although recognizing that the department was actually a respondent in Docket No. 222513. By the same token, we will refer to Columbia and Four Flags collectively as plaintiffs, again recognizing that Columbia was actually a petitioner in Docket No. 222513.
 

 [2]
 

 2 It appears that despite the specific language referencing only hbo and Showtime, the policy was applied in general to payments made to any satellite programming network.
 

 [3]
 

 3 In
 
 Mobil Oil Corp v Dep’t of Treasury,
 
 422 Mich 473, 493; 373 NW2d 730 (1985), our Supreme Court explained the nature of a value-added tax:
 

 The economic process consists of the use of various inputs in order to produce final goods. These inputs include: raw materials or land, intermediate goods, labor, capital, and profits. The value added to the economy by the production of final goods is the sum total of all the inputs into their production. The value added by the production of a final good is the sum of the value of the raw materials, intermediate goods, labor, capital, and the profit which were combined in order to produce that final good. The value-added tax is imposed on the value added by the production of the final good or, to say the same thing in another way, upon the use of all these inputs in adding value to the economy. [Citation omitted.]
 

 [4]
 

 4 For corporations, business income means federal taxable income. MCL 208.3(3).
 

 [5]
 

 Defendant claims on appeal, contrary to counsel’s statements before the Tax Tribunal, that it has treated cable operators as broadcasters under MCL 208.9(4)(g)(vi), and therefore, cable operators have not had to add affiliation fees to their tax bases. As noted above, although Columbia was audited for the tax years of 1992-94, defendant did not require Columbia to add affiliation fees to its tax base after the 1993 amendment became effective.
 

 [6]
 

 In essence there was a “meeting of the minds” between defense counsel and plaintiff, but not defendant and plaintiff. Defense counsel was simply mistaken regarding the status of the 1986 policy.
 

 [7]
 

 Plaintiffs rely on factual distinctions between cable system operators and television broadcasters; however, plaintiffs continually fail to state why those distinctions result in affiliation fees being removed from the royalty classification.
 

 [8]
 

 We find it unnecessary to determine whether the 1993 amendment found in MCL 208.9(4)(g)(vi) actually obligates cable operators to add back affiliation fees to their single business tax bases. Although the Tax Tribunal ruled that the 1993 amendment did in fact obligate cable operators to treat the affiliation fees as royalties to be added back to the tax base for purposes of the sbta, the matter is both moot, in relation to plaintiffs, and not properly before us, in relation to defendant. Defendant and plaintiffs apparently agree that the Tax Tribunal was incorrect in concluding that cable operators are required to add back affiliation fees after the 1993 amendment; however, defendant has not filed a cross appeal with respect to the tribunal’s decision. Moreover, neither plaintiff was required by defendant to add back affiliation fees paid to networks after the 1993 amendment. Any ruling by us concerning the issue would not have application to the taxes in dispute in these cases; therefore, the issue is moot.
 

 [9]
 

 Justice Markman noted the following in his concurring opinion in
 
 Blank v Dept of Corrections, 462
 
 Mich 103,
 
 148-149;
 
 611 NW2d 530 (2000):
 

 This Court’s recent disapproval of legislative acquiescence in
 
 Donajkowski, supra
 
 at 258-261, implicitly recognized that the only legislative intent that is relevant to interpreting a statute is the intent of the Legislature that enacted it. Consequently, subsequent inaction by a
 
 different
 
 Legislature, whether it be silence or the rejection of an alternative proposal, cannot properly serve as an indicator of what a prior Legislature intended. [Emphasis in original.]